**KEYSTONE PLASTICS, INC., Plaintiff,**

**v.**

**C & P PLASTICS, INC., Defendants.**

**Civ. A. No. 68–1209.**

United States District Court,
S. D. Florida,
Miami Division.

March 14, 1972.

John Cyril Malloy, Miami, Fla., Howard C. Miskin, New York City, for plaintiff.

Hiram P. Settle, Jr., Detroit, Mich., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FINAL ORDER

KING, District Judge.

This cause having come on for Trial before this Court, sitting without jury, and the Court having heard and received the proofs and arguments of the parties hereto, the Court hereby makes the following Findings of Fact and Conclusions of Law:

1. *Parties*: Plaintiff, Keystone Plastics, Inc., is a corporation of the State of New York, owned and operated by Mr. & Mrs. William Gould, with its place of business in South Plainfield, New Jersey. Defendants, C & P Plastics, Inc., and C & P Industries, Inc., are corporations of the State of Florida, with their place of business in Hallandale, Florida. Individual Defendants, Gerald Carey and Walter Polnau are each officers, employees, joint owners and co-founders of the corporate Defendants and both individuals reside in Florida, within the jurisdiction of this Court.

2. *Nature of Action*: Plaintiff complains that Defendants infringe Plaintiff's U. S. Patent No. 3,216,038 issued November 9, 1965, and U. S. Patent No. 3,330,721, issued July 11, 1967; that Defendants have improperly acquired, through a breach of confidential relationship, and have used certain trade secrets belonging to Plaintiff; and that Defendants have committed certain acts which violate the antitrust laws, causing damage to Plaintiff.

3. *Jurisdiction* of this Court as to the Patent Count is based upon the Patent Statutes, 35 U.S.C. § 281 et seq., and 28 U.S.C. §§ 1338, 1400(b). Jurisdiction as to the Trade Secret Count is based upon diversity of citizenship with the amount claimed to be in controversy exceeding $10,000. Jurisdiction as to the Anti-Trust Count is based upon the Sherman Act, 15 U.S.C. §§ 1, 2; the Clayton Act, Sections 2, 4, 15, 15 U.S.C. §§ 13, 15 and 26; and the Robinson-Patman Act, 15 U.S.C. § 13.

4. *General Subject Matter-in-Suit*: Both Plaintiff (hereinafter called "Keystone") and Defendants (hereinafter collectively referred to as "C & P") are engaged in the business of manufacturing and selling, interalia, street sweeper bristles and mats made of bristles, which bristles are extruded, stretch oriented, polypropylene plastic material. Thus, this suit involves, in general, the arts of brush making and plastic extrusion.

5. *The trial* of this cause took 13 Trial days. On the first day, by agreement between the parties, this Court visited C & P's manufacturing plant in

Hallandale. During this visit, the Court personally observed the extrusion line equipment, processes and techniques utilized by C & P in producing both its bristles and mats, starting with the raw plastic material and ending with the boxed bristles and mats ready for shipment. During the remainder of the Trial, the Court heard and had the opportunity to judge of the credibility and demeanor of a large number of witnesses, identified below; read the transcripts of a large number of depositions taken prior to Trial; studied Briefs submitted by both parties; studied a large number of documents, including charts, drawings, and the like offered in evidence; and heard oral arguments of Counsel, both at the conclusion of Plaintiff's proofs and at the end of Trial. Thus, this Court was thoroughly educated by the parties to understand and grasp the factual and legal issues presented herein and to render its decisions on these issues.

6. *The Witnesses*: During Trial, the Court heard the live testimony of sixteen witnesses, namely:

*For Plaintiff*:

(1) William Gould, co-owner and officer of Keystone, co-patentee of the two patents-in-suit and claimed developer of Keystone's trade secrets;

(2) Marvin Naftel, a plastic scrap dealer and processor from New Jersey;

(3) Dr. Leslie Kovach of New York City, Vice President of Modern Plastic Machinery Corporation, plastic machine builders;

(4) Walter Polnau, an individual Defendant called on adverse examination;

(5) Professor Walter King of the University of Miami, who testified as to measurements he made of both Keystone's and C & P's equipment, processing speeds and temperatures;

(6) Mrs. William Gould, the other co-owner and co-patentee and officer of Keystone.

*For Defendants*:

(7) Stanley Grambor, Vice President of Keystone, called on adverse examination;

(8) Robert E. Cook of Ann Arbor, Michigan, formerly an employee of Roadmaster Brush Company of New Jersey;

(9) Hugh Archer of Spiro-Tex Company, Dearborn, Michigan, an expert in the field of plastic extrusions;

(10) Dr. John P. Horton, President of Newark Brush Company, Kenilworth, New Jersey;

(11) Waldemar Mundy of Parma, Ohio, an engineer employed in 1964 by Lejerbe Incorporated of Arcadia, California, to set up a polypropylene street sweeper bristle extrusion line;

(12) John Carey of Limerick, Ireland who was a former part owner of Carey Plastics Company of New Jersey, the other owners being his two brothers, i. e., Defendant Gerald Carey and Gilbert Carey; and

(13) Defendant, Gerald A. Carey;

*On Rebuttal for Plaintiff*:

(14) Dr. William J. Sparks of Coral Gables, Florida, retired Director of Engineering of the Enjay Laboratories of Standard Oil of New Jersey;

(15) Milton H. Gross, patent attorney of Miami Beach, Florida, whose testimony was excluded [1];

---

1. Mr. Gross, a patent attorney, is admittedly not an expert in (Tr. 1783), nor has he had any direct experience in (Tr. 1787) the subject matter of this suit, e. g., the art of plastic extrusion or extrusion of polypropylene or the manufacture of bristles. He was offered as a witness by Plaintiff (a) for the purpose of "reading patents", which were admitted into evidence and "interpreting these patents for the Court as an expert" (Tr. 1789–1789A) and (b) for the purpose of giving "an expert opinion on . . . how the Patent Office classifies its art in the normal course of searching" (Tr. 1791–1792), although he admittedly has not worked for the Patent Office (Tr. 1792). Therefore, the Court excluded his testimony due to his being unqualified as an expert in the relevant field (Tr. 1790,

(16) Richard B. English of Pasedena, Florida, formerly an officer of Lejerbe (now called Interplex), manufacturers of polypropylene brush bristles, and lastly, William Gould, recalled as a rebuttal witness.

7. *Deposition Witnesses*: In addition, during the time of Trial, the Court read the deposition testimony, either entirely or the parts designated by the parties, of ten witnesses, as follows:

(1) Gilbert Carey, the third Carey brother involved in the Carey Plastics Company (PX 79 and 83);

(2) James O'Neill, employed by Keystone as a foreman (PX 78);

(3) William Wehrenberg, an engineer, of Wachtung, New Jersey, who built a die for Carey Plastics (PX 86, DX M);

(4) Joseph Shenkman, an officer of Industrial Plastics Company, Edison, New Jersey (PX 82, DX M), a plastic extrusion business which employed Defendant Polnau years ago;

(5) James R. Eagle of New York, an engineer employed in 1959–1962 by Enjay Chemical Company, producers of polypropylene raw material plastics, as a technical sales representative who called upon Roadmaster Brush and Plaintiff Keystone (PX 84, DX M);

(6) Barry Cook of New Jersey, who worked for Roadmaster in 1959 (DX M);

(7) Everett C. Bailey, President of E. B. & A. C. Whiting Company of Burlington, Vermont, the first to produce and market polypropylene street sweeper bristles (PX 71);

(8) Howard Weber, Manager of Blue Ridge Oil Company of Garfield, New Jersey, a customer of the parties (Tr. 954);

(9) George E. Berry, an engineer employed by Newark Brush Company (EX L); and

(10) Portions of the depositions of the Defendant Walter Polnau (pp. 339–352 of deposition of May 1, 1969, Tr. 960).

8. *Street Sweeper Brushes*: The extruded polypropylene plastic bristles involved in this suit are used in mechanical street sweeper brushes. Previously, brushmakers used a variety of materials for bristles, including natural fibers, wire strands and extruded nylon. These bristles, e. g., 26″ in length were bent in half into hairpin shape and fastened at the bent portions to a base or core. One type of fastening was accomplished by means of arranging a rope-like cable between the two bent legs of each strip, to tie the bristles to the brush core. The completed brush was cylindrical in shape, with each of the bristles extending radially outwardly of the core. Such brushes are used in mechanized street sweepers commonly seen on city streets.

9. *Polypropylene Bristles*: When polypropylene plastic became available in the mid-1950's, E. B. & A. C. Whiting Company began extruding and selling street sweeper bristles of such plastic material. A second company, Reeves, then began producing and marketing such type bristles. Thereafter, in late 1960, Plaintiff Keystone, which previously had been in the business of extruding various plastic items, set up an extrusion line and began extruding polypropylene street sweeper bristles. Keystone first sold such bristles shortly after the start of 1961. The record shows that at least a fourth company, Lejerbe, Incorporated, set up an extrusion line and began extruding polypropylene street sweeper bristles in 1964.

10. *Carey Plastics Company*: Sometime after January 1, 1965, Carey Plastics Company of New Jersey, which was owned and operated by the three Carey brothers, namely, Gilbert, John and Defendant Gerald, and which had been in the plastic extrusion business for some years, unsuccessfully endeavored to set

1794), the Court preferring to read the patents itself and to hear and rely upon the arguments of the parties' respective patent counsel, rather than to receive these in the form of testimony of a patent attorney (Tr. 1793–1794).

up an extrusion line to produce polypropylene street sweeper bristles. In June of 1965, the three Carey brothers split up, Gilbert remaining as the owner and operator of Carey Plastics, John returning to Ireland from whence the brothers had originally come, and Defendant Gerald going into business in July of 1965 with co-Defendant Walter Polnau, as C & P Plastics, located in Florida.

11. *Basis for Claim of Theft of Trade Secrets*: Plaintiff's claim of theft of trade secrets is bottomed upon Carey Plastics' efforts to produce polypropylene bristles. That effort began when a potential customer invited Carey Plastics to supply polypropylene bristles. The Careys had just previously engaged in an aborted effort to produce polypropylene rod, in which project they cooperated with their next-door neighbor Waltrich Plastics Company. Waltrich Plastics, which was owned and operated by Defendant Walter Polnau and two other persons, was in the business of extruding polypropylene strands used for seat webbing and was experienced in the art of extruding polypropylene and, its prior business activity involving the extrusion of other plastics. Walter Polnau had left Waltrich before January 1, 1965 and had moved to Florida after the failure of the rod project. Carey Plastics turned to and received assistance from the remaining operators of Waltrich in its efforts to produce polypropylene bristles. Based upon the information given by Waltrich, Carey Plastics ordered a die and began acquiring and assembling the necessary extrusion line equipment. After these first efforts by Carey Plastics, one Edward Vincent entered the picture.

12. *Vincent's Activities*: Vincent, who is related by marriage to John Carey, was employed by Keystone in mid-1964 as a maintenance mechanic. In early 1965, after some, but not all, of Carey Plastics' bristle extrusion equipment was acquired, Vincent met with the Carey brothers and was asked to obtain information from Keystone relating to Keystone's bristle extrusion equipment line. The Court finds that Vincent did attempt to steal some information from Keystone and did transmit at least some information to Carey Plastics on at least one subsequent occasion, and that he was paid by Carey Plastics for that information. Just exactly what he took is not clear. He did not testify. There is a sharp conflict between the relevant deposition testimony of Gilbert Carey and the Courtroom testimony of John and Gerald Carey. However, the Court finds, as will be specified below in more detail, that what Vincent attempted to steal was not secret, and that his efforts were for nothing. Moreover, based upon the considerable testimony about Vincent, about the Keystone extrusion line and about the efforts of Carey Plastics prior to the departure of the Defendant Gerald Carey, this Court finds that Vincent was not capable of stealing the technical information involved, nor was he capable of accurately or correctly transmitting it to Carey Plastics.

13. By June of 1965, when the Carey brothers separated, Carey Plastics did not have an operative or completed bristle extrusion line, and it had not produced, nor was it capable of producing, polypropylene street sweeper bristles. Carey Plastics (now owned and operated solely by Gilbert Carey and now employing Vincent on a fulltime basis) did complete its line and produce and sell bristles for a short time, but this was (1) long after Defendant Gerald Carey had left Carey Plastics, (2) long after C & P had gone into business, and (3) after C & P had begun producing and marketing its own bristles. Keystone sued Carey Plastics for infringement of these same two patents here in suit, and Carey Plastics settled by entering into a consent decree injunction and judgment for $1,000, which evidently was never paid. Gilbert Carey sold Carey Plastics' bristle extrusion line to Newark Brush Company in about 1968. Shortly after the start of this suit, he gave his deposition testimony (PX 79 & 83) on behalf of Plaintiff. His testimony, whether justified or not, reflects a great deal of ani-

mosity towards and bias against his brother Gerald, Defendant in this suit, and the bulk of it is rejected by this Court as unreliable, particularly since much of it is based upon hearsay, much of it is unclear as to the timing of various acts (e. g., before or after the time the brothers separated), and much of it is contradicted by other testimony and proofs, which this Court accepts. In short, this Court places little, if any, reliance upon Gilbert Carey's testimony.

14. *Gap Between Keystone and C & P*: Starting in July of 1965, Defendant Walter Polnau, designed, constructed and purchased the necessary equipment components which he personally set up as C & P's polypropylene bristle extrusion line. He was in production by November of 1965. Polnau had no contact with Vincent or Keystone, nor did he ever have any contact with or knowledge of Carey Plastics' polypropylene bristle extrusion efforts. He had never seen either Keystone's or Carey Plastics' equipment or lines. He had no knowledge of Keystone's equipment or processing techniques prior to the Trial. Prior to setting up the C & P line, Polnau had many years of experience in the plastic extrusion art, including in the art of extruding polypropylene. He had earlier built and operated the Waltrich polypropylene extrusion equipment, and he had the experience and ability to build C & P's extrusion line without information from others. The Court finds that he so did.

15. The proofs clearly demonstrate, and the Court so finds, that Polnau bought a commercially available extruder, and then personally built, with his own two hands, all of the other C & P equipment, using in some cases second hand gears, junk automobile parts, second hand motors and the like, which he acquired at scrap yards. The only help Polnau received was some welding done by Gerald Carey at the time the line was close to completion. This welding help took place after Gerald Carey moved to Florida in the fall of 1965, and was after the design was completed and most of

the equipment components were completed. Gerald Carey did make one or more suggestions (e. g., using air pressure in the die, which is not claimed by Keystone to be one of its trade secrets), which Polnau rejected entirely and did not use. By using junk parts and his own labor, Polnau built the line at C & P at a fraction of the cost of purchasing commercially available equipment (i. e., about $15,000 actual cost versus about $100,000 or more for purchased commercially available equipment).

16. The Court finds that Plaintiff has failed to sustain its burden of proof that its alleged secret information ever got to or was used by C & P. C & P's extrusion line is the product of Walter Polnau and was not derived in any way at all from Keystone. Regardless of what took place earlier at Carey Plastics, there was a gap between Keystone and C & P. In summary, the Court finds (1) that C & P has not improperly obtained, nor has it used, any information taken from Keystone, (2) that C & P was never in any confidential relationship with Keystone, and (3) that C & P did not and could not breach any confidential relationships with Keystone. The same finding is applicable to the individual Defendants Polnau and Gerald Carey. Specifically, as to Gerald Carey and regardless of what earlier had occurred at Carey Plastics, he did not use any Keystone information at C & P.

THE TRADE SECRETS COUNT

17. *General Process Used in Extruding Bristles*: An extrusion line for producing bristles begins with an extruder, which is a commercially purchased device. Raw material is placed into one end, the plastic is melted and forced by a screw out of the other end through a die. In essence, the die is a plate with one or more holes through which the molten plastic is continuously squirted to form a continuous strand, very much like toothpaste coming out of a toothpaste tube. Upon coming out of the die hole, the plastic material forming the strand is homogeneous or non-fibrous.

The hot strand from the die is then cooled and solidified by passing it through a tank or trough filled with cold water. From there, the strand passes through a roller arrangement (called a "first godet") and into a heated tunnel-like oven, (called a "stretch" or "orienting" oven). At the exit end of the oven, a "second godet" receives and pulls the strand. The second godet is driven at a greater speed than the first godet, so that the strand portion between them is stretched as it is heated in the oven. This stretching elongates and aligns the molecular structure of the plastic, forming hair-like fibers extending along the length of the strand. The strand is now "linearly oriented" or fibrous, and is no longer homogeneous.

18. The linearly oriented strand is next passed through a second "annealing" oven or other heating means, where the newly formed fibers are "relaxed" by heat to reduce their tendency to curl. The strand is then cooled in a second water bath. After that, the strand is cut into bristle lengths, e. g., 26" lengths, which are either placed into boxes for shipment as loose bristles, or else are assembled into bristle mats before boxing. Mats are simply a number of bristles laid side by side in a common plane and fastened together at their centers to form a sheet.

19. *Claimed Trade Secrets Relate to Details*: The above described general extrusion processing may be varied in a number of details. Thus, the times and temperatures of heating in the ovens and cooling in the water, the speed of travel of the extruded strand, the amount of material coming out of the extruded die, the number of strands simultaneously extruded, the distances between the various line components, the degree of stretching or orienting of the strand, the sizes and shapes of the die openings, the lengths of the ovens and cooling tanks, the "godet" constructions, etc., all may vary. The raw material may be varied so that the resultant bristles may be made either clear or colored, such as brown, green, red, etc. Also, the bristles may be either straight or "crimped", i. e., made wavy along their lengths by running them through meshing gears. A number of these variations or "differences" are claimed by Keystone to be its trade secrets which allegedly were purloined and used by C & P.

20. Keystone does not claim to be the first to develop or to extrude and stretch orient polypropylene bristles. Rather, it claims as its secrets only certain processing details, as stated by Gould (Tr. 178–179):

"Q. As I understand your testimony this morning, you do not claim to be the first pioneer to stretch, orient polypropylene; is that correct?

A. Yes.

Q. In fact, you are not the first to sell, place on the market, develop a stretch oriented polypropylene street sweeper bristle?

A. Yes.

Q. You were?

A. No. I said no.

Q. Your stretched oriented polypropylene street sweeper bristle differs in certain details from those which were on the market at the time you first offered yours; is that correct?

A. Yes.

Q. And the process by which you make your stretch oriented polypropylene bristle differs from the processes that were used prior to you in certain details; is that correct?

A. Yes.

Q. It is these details and differences which you allege to be your proprietary information; is that correct?

A. Yes."

21. *Failure of Trade Secret Claim*: At the outset, Keystone's claim that it owns trade secrets and that these were

used by C & P falls flat for four basic reasons:

(a) *Publication by Keystone*: Keystone itself did not keep secret many of its alleged trade secrets. It relinquished any claim to ownership of these trade secrets by publishing them, long prior to the time of the alleged taking, in its Gould Canadian Patent No. 683,655, published April 7, 1964 (about a year prior to the alleged theft by Vincent), see EX. A, Tab 79 (Prior Art Book), EX. D (certified copy of Canadian patent) and EX. E (photocopy of Canadian patent from the files of the U. S. Patent Office). Obviously, a trade secret must be preserved in secrecy by the owner. If he himself published it, it can hardly remain his secret. The Court thus finds that publication of the Canadian Patent No. 683,655 by Keystone amounts to a specific repudiation of any alleged trade secrets disclosed therein as of the date of publication.

(b) Second, as will be reviewed below in more detail, the proofs overwhelmingly demonstrate that the alleged trade secrets were techniques which were commonly known to the trade and commonly used by those skilled in the extrusion art to make bristles as well as other types of extruded strands.

(c) Third, Defendants' extrusion line differs in every material detail from the line of Keystone. Defendants simply do not utilize the same variations or details as does Keystone. As was demonstrated by the detailed comparative measurements taken by Prof. King, there is not a single common dimension, temperature or speed (Tr. 831) between the two lines. "There is no component of the Keystone line that is identical with the components of the C & P line" (Tr. 837). The dies are different in shape and size (Tr. 831), Keystone using 5 or 7 oval die openings to extrude 5 or 7 oval shaped strands and C & P using 4 or 6 round die openings to extrude circular shaped strands which are later flattened by a special roller. The water baths are different (Tr. 833), the godets are different in construction and size (Tr. 833, 834); the orienting ovens (Tr. 834) and annealing ovens (Tr. 835) are different in both size and temperatures; the crimper rolls or gears differ in both size and shape (Tr. 836) and are located in different places in the line; Keystone uses a pulley cooling system, C & P does not; the end products are different (Tr. 826); Keystone uses a drying venturi device, C & P does not; etc. In short, while there is a similarity in the general overall arrangement and processing, the two lines differ substantially in every material detail.

(d) Fourth, as set forth above, Walter Polnau did not use information derived from Keystone (Tr. 683), or from Carey Plastics (Tr. 653) when he himself designed and built C & P's extrusion line (Tr. 687–688).

22. *Lack of Clear Proof of Existence and Use of Secrets by Keystone*: Before going into the details of each alleged trade secret, it should be noted that the fact of *existence* of and *use* by Keystone of the claimed trade secrets at the time of the alleged taking comes before this Court with very skimpy proofs. The *existence* and *use* claims of Keystone were presented to the Court by the oral testimony of Mr. Gould, without corroborating documents, except for his Canadian patent which negates secrecy. Complicating this further, Keystone's present line, which was the subject of much Trial testimony, was built in 1966, *after* the alleged theft. Although Mr. Gould claims it is the same as the line he had in the 1964–65 period, this is somewhat questionable, as he also testified that the 1966 line extrudes at roughly three times the rate of the 1964–65 line, and that the later line extrudes seven strands simultaneously, whereas the earlier line extruded only four or five strands at a time. Complicating this still further, Vincent advised Carey Plastics that Key-

stone extruded only two strands simultaneously, and the Carey Plastics line purchased by Newark Brush extruded only two strands. Thus, while the existence and use by Keystone of each of the alleged trade secrets at the relevant time has not been unequivocally established by Plaintiff and is somewhat doubtful, at least in part, it is not necessary for the Court to resolve that question here.

23. *Identification of Claimed Trade Secrets*: The particular trade secrets involved were never clearly identified by Plaintiff until the time of Mr. Gould's cross-examination at Trial. The record shows that prior to that time, the identification and descriptions of the claimed secrets has varied repeatedly throughout the course of this litigation. Early in the litigation, Gould listed twenty-four trade secrets in answer to an Interrogatory, these later being modified in his deposition. Thereafter, upon being furnished drawings of Defendants' line, he changed the list, adding more to a total of thirty-two alleged secrets. This list was again modified in a second deposition. The list and the items identified on the list were again changed to twenty-two secrets found on the list appended to the Pre-Trial stipulation. Gould's Trial testimony changed the number and substance of the list again, now limiting the trade secrets to fourteen items, many differing from those previously claimed before Trial. By way of example, at Trial he claimed for the first time that his entire line was a secret, something he had not previously claimed, and, incidentally, something published by him in his Canadian patent. The Court resolves this confusion as to identity of the alleged secrets by considering only the very last of Gould's list, namely, the items found in the Trial transcript of Mr. Gould's oral testimony. These shall now be considered on an item-by-item basis, as follows:

24. *Claimed Trade Secret No. 1* is stretching the strand to a stretch ratio of 10 or 11 to 1, i. e., ten times its original extruded length (Gould, Tr. 145,

180). Gould admitted that he published the fact that he manufactured bristle at such stretch ratio on April 7, 1964 in his Canadian patent (Tr. 184). Thus, the Court finds that this was not a legally protectable trade secret, having been relinquished as a secret by Plaintiff's own publication.

25. In addition, the use of such stretch ratios in extruding polypropylene was common trade knowledge by 1964. Mr. Archer, Defendants' expert, testified that he had used such ratios for polypropylene as early as 1958–60 (Tr. 1198–1199) and that it was well known to the art in 1964 (Tr. 1199). Dr. Kovach, Plaintiff's expert, also testified that it was well known (Tr. 1198) and indeed, was specified by the raw material suppliers in 1964 (Tr. 1199). It was used for polypropylene street sweeper bristles by Lejerbe in 1964 (Mundy, Tr. 1517–1518). Its use for polypropylene street sweeper bristles was also published by the Whiting Company in 1963 in the Munt Patent No. 3,073,002 (see Trade Secret Charts, EX. B, Chart 8; also EX. A, Tab 33) and again in another Munt Patent No. 3,112,508 (EX. B, Chart 7; EX. A, Tab 38).

26. Lastly, Defendant does not use that particular stretch ratio, rather operating at average ratios of 8½ to 1 (Polnau, Tr. 705) or lower (King, Tr. 811). Nor does Plaintiff, at least at this time, use that particular stretch ratio. Keystone currently is stretching at a ratio of about 9 to 1, according to Prof. King's measurements (King, Tr. 811).

27. Thus, this Court finds that the alleged secret of stretch ratio is not a legally protectable trade secret and was not used by C & P.

28. *Claimed Trade Secret No. 2* is the use of a second oven and an immediate quench after that oven (Gould Tr. 184–185). However, Gould admitted that he published that Trade Secret in 1964 in his Canadian patent, prior to the time of the alleged taking (Tr. 187). Hence, this Court finds that it was not a protectable trade secret, having been

relinquished by Keystone's own publication.

29. This item had not been previously claimed as a trade secret in any of the Pre-Trial lists of trade secrets. Moreover, it is a "common mechanical arrangement" (Archer Tr. 1199), used by Archer as early as 1958–1960 (Tr. 1199) and others seen by him, and was known to the trade. It was also published by Whiting in its Munt Patent No. 3,073,-002 (EX. B, Chart Book, Chart No. 8; EX. A, Tab 33) for use in producing polypropylene bristles. Further, C & P does not use it. According to Polnau, C & P does not immediately quench nor does it want to (Polnau, Tr. 688). Rather C & P's strand is annealed in its second oven and the cooling tank is spaced a distance from the second oven to avoid an immediate quench, serving instead merely to cool the annealed strand so that it can be handled for boxing. The Court finds that this item is not a trade secret and is not used by C & P.

30. *Claimed Trade Secret No. 3* is extruding horizontally (Gould Tr. 188). At Trial, Gould admitted that he published this alleged trade secret in his Canadian patent in 1964 (Gould Tr. 188). Prior to trial, he also admitted this prior publication. (See Plaintiff's Answer dated June 23, 1971 to Defendants' Interrogatory No. 4.) Moreover, extruding horizontally was common knowledge of the trade as evidenced by the testimony of Archer (Tr. 1278), Kovach (Tr. 375), Mundy (Tr. 1514), Cook (Tr. 1125), and Polnau (Tr. 705), each of whom had either used it or seen it used or both. It is also illustrated in a number of the prior art patents found in Defendants' Book of Patents, Exhibit A. Polnau had personally used it as early as 1958 (Tr. 706). Hence, the Court finds that this is not a trade secret.

31. *Claimed Trade Secret No. 4* is the use of a mandrel to control voids (Gould Tr. 194). A mandrel is an insert arranged in the center of a die hole, so that the molten plastic is forced to flow out of the die hole around the mandrel. This forms a central hole in the extruded strand and is the commonly known way to extrude tubes.

32. In extruding solid strands, i. e., without mandrels, the outer surfaces of the strand cools and solidifies first. Thus, as the inner, still molten, material solidifies and shrinks, voids, which look like elongated bubbles, tend to form along the center line of the strand. To eliminate these numerous, discontinuous voids or holes at the center of the strand, Keystone extrudes a tube, using a mandrel, so that there is only one continuous hole extending through the center of the strand.

33. Keystone's use of a mandrel in extruding bristles admittedly was published by Gould in 1964 in his Canadian patent. (Gould Tr. 199,200). He also admitted such publication prior to Trial in answer to Pre-Trial Interrogatories (see Interrogatory Answer dated June 23, 1971). Hence, it is not a trade secret, having not been kept secret by Plaintiff.

34. Moreover, the use of mandrels to extrude tubular shaped strands out of polypropylene, as well as other plastics, is an old, commonly known and commonly used manufacturing technique. It was also common to vent the mandrels to atmosphere (a trade secret claimed in the Pre-Trial Statement List, but not as Trial). (Kovach Tr. 388; Cook Tr. 1113; Archer Tr. 1205; Polnau Tr. 693). This technique was also widely published, as exemplified by EX. B, Chart Book, Chart Nos. 14 (EX. A, Tab 34), 15 (EX. A, Tab 52), 16 (EX. A, Tab 51), 17 (EX. A, Tab 22), 18 (EX. A, Tab 2) and 19 (EX. A, Tab 1).

35. C & P's bristles are tubes, made by conventional tube extrusion techniques, which Polnau has used since as early as 1953 (Polnau Tr. 694). Thus, C & P did not acquire this alleged trade secret from Keystone.

36. Further, using a mandrel for the express purpose of controlling voids or making them into one continuous hole

as a tube, was also earlier known to and used by the art (Mundy, Tr. 1513). The specific type of mandrel which is used by Keystone, namely, a hypodermic needle (Gould Tr. 193) is not a trade secret according to Gould (Tr. 193), although apparently it was claimed to be a trade secret before Trial. Thus, to the extent that this ever was claimed to be a trade secret, this too was known to and commonly used by the art (Mundy Tr. 1525; Archer Tr. 1205). Besides, Polnau did not use a hypodermic needle as a mandrel at C & P. Rather, he used a piece of one-eighth inch diameter welding rod which he happened to have available when he built C & P's die, before Gerald Carey came to Florida. Hence, the Court finds that this item, the use of a mandrel, is not a trade secret.

37. *Claimed Trade Secret No. 5* is the fact that the size of the die is critical in determining the size of the finished article (Gould, Tr. 192). Gould admitted that this fact is true in every single extrusion operation that has ever been carried out (Gould, Tr. 192), and was common knowledge in the art for at least 20 years, (Tr. 192–193). It was common knowledge in the art at least prior to 1965 according to Kovach (Tr. 414), Archer (Tr. 1201) and Mundy (Tr. 1514). Further, C & P uses a different size and shape die than does Keystone. C & P uses a round die opening of about one-half inch diameter, whereas Keystone uses an oval die opening of a different size. Oval die openings are also common knowledge of the trade (Kovach, Tr. 411). Hence, the Court finds this not to be a trade secret, rather it is a mechanical commonality.

38. *Claimed Trade Secret No. 6* is controlling quality by observing the white line and manipulating the place where the strand comes out of the first water bath. (Gould, Tr. 189.) What is involved here is that when the interior wall of an extruded tub solidifies, a surface phenomenon takes place which gives a white appearance to that wall. Since the hole extends the length of the tube, so does its wall and thus the white line. This white line is visible only when the tube is made of clear plastic and is not visible if the tube is made of colored plastic, as for example, the brown, green, red, etc., colored bristles made by both parties (Tr. 1647, Gould Tr. 1811).

39. The white line, when it is visible during the extrusion of clear plastic, may be used as a comparative indicator of cooling conditions (Archer, Tr. 1201) to one who knows from experience what to look for (Gould Tr. 190). One who observes it regularly knows that a change in its appearance indicates a change in cooling conditions. Cooling is regulated by leaving the strand in the cooling water for a longer or shorter time. This technique was common knowledge in 1964, used by Archer and seen by him in use by others (Archer, Tr. 1204).

40. Both John Carey and Gerald Carey testified that they never knew of this technique before this lawsuit (Tr. 1553, 1679); although Polnau testified that he had known of this himself and had used it (Tr. 657). The Court finds this item to be a mechanical commonality, commonly known to the art and not a trade secret.

41. *Claimed Trade Secret No. 7* is (a) the specific design of crimper rolls (Gould Tr. 204) and (b) locating these rolls at a point where the strand is relatively cool (Gould Tr. 204). Crimper rolls are a pair of meshing gears between which an extruded strand is passed so that the gear teeth crimp or bend the strand to form a wavy pattern along its length. This is a commonly known and commonly used device (Kovach Tr. 387; Archer Tr. 1207; Mundy Tr. 1519; Cook Tr. 1081). The Goulds themselves were shown such a device used at Roadmaster during their numerous visits there from 1954–55 up to early 1962 (Tr. 1105). At Roadmaster they were used for crimping both wire bristles and the straight plastic bristles which Roadmaster purchased from Keystone (Tr. 1081).

42. C & P's crimper gears are different than those used by Keystone

(Polnau Tr. 695,699; King Tr. 836). Polnau bought C & P's crimper gears from a catalog (Tr. 694–695). He did not get them from Keystone.

43. Locating the crimper gears to act upon a cooled strand was also a common practice, known to the art, and earlier used by Polnau at Waltrich (Tr. 593). The art also located such gears where the strand is hot, depending upon the desired results (Archer Tr. 1206–1207). Keystone and C & P locate their crimper gears in different locations for different purposes. C & P's gears are located just after the second water bath, so that the crimper both pulls the cooled strand out of the water bath and crimps. Keystone locates its gears beyond its cutter and center crushing step, as the very last step in its line (King Tr. 836). Consequently, the Court finds that this item is not a trade secret, nor was Keystone's particular design or location arrangement used by C & P.

44. *Claimed Trade Secret No. 8* is notching the end of the water tank to receive the strand and letting the water spill or "cascade" out of the notched end. (Gould Tr. 220). That technique is commonly used in extrusion shops (Archer Tr. 1209; Mundy Tr. 1515; Cook Tr. 1125); was used by Archer in extruding polypropylene tube as early as 1958 (Tr. 1208); was first seen in use by Mundy in 1953 (Tr. 1515); and was used at Roadmaster in an extrusion line (Cook Tr. 1114). It was also published in a number of patents, such as French No. 3,298,063 filed in 1964 (Chart No. 20, EX. A, Tab 45); British No. 564,324 published 1944 (Chart No. 22, EX. A, Tab 47); Bill No. 3,277,656 filed June, 1965 (Chart No. 23, EX. A, Tab 43). The Court finds that this technique is not a trade secret, but rather was common knowledge of the art.

45. *Claimed Trade Secret No. 9* is placing a fourth roll on the godets to function as a snubber to prevent slippage (Gould Tr. 264–265). Gould testified that the more rolls used, the greater the resistance to slippage (Tr. 268–269). For example, he testified that the Bre-zemer patent No. 2,987,373, EX. A, Tab 26, shows five rolls for greater resistance to slippage.

46. C & P does not use a fourth roll at all on its second godet (Archer Tr. 1210; Polnau Tr. 704), which is the place where slippage would be expected (Archer Tr. 1210). C & P does use a fourth roll on its first godet, but for an entirely different purpose, namely as a flattening roll to flatten the extruded round tube into an oval shape (Archer Tr. 1209; Cook Tr. 1119; Polnau Tr. 704, 660–661). The use of flattening rollers for this purpose was previously known (Cook Tr. 1120, 1125). The Court finds that the snubber roll is not a trade secret, but rather is a mechanical commonality. Further, the claimed roll function is not used by C & P.

47. *Claimed Trade Secret No. 10* is the circulation of water in the first water bath to avoid hot spots (Gould Tr. 276.) This was a common practice in the art in 1964 (Archer Tr. 1211). Such water tanks, which were built and sold by Dr. Kovach's company prior to 1965, included means for such circulation (Kovach Tr. 376, 378). Moreover, C & P does not use it; in C & P's tank, the water simply is poured into the water tank through a garden hose and then flows out through the end of the tank, with no other means for circulation (Polnau Tr. 656). The Court finds that this was not a trade secret and, moreover, was not used by C & P.

48. *Claimed Trade Secret No. 11* is Keystone's entire line and process (Gould Tr. 285). At the outset, Keystone never claimed this as a trade secret prior to Gould's Trial testimony. It is absent from the various lists of trade secrets, including the one attached to the Pre-Trial Order. Second, it was published by Gould in 1964 in his Canadian patent, e. g., see Fig. 1, which diagrammatically illustrates the entire line and process. Thus, if it ever was a trade secret, it was relinquished by Plaintiff's own publication and failure to maintain it in secrecy.

49. C & P does not use the same line and process as does Keystone. C & P's line was not based upon any information obtained from Keystone (Polnau Tr. 683) and all of its components were built by Polnau without knowledge of nor contact with Keystone's operation (Polnau Tr. 687–88, 684). According to King, who actually closely compared C & P's line with Keystone's line, all of the components are different, and there is not a single common dimension, temperature or speed (King, Tr. 831–836). The types of components differed, too. For example, Keystone used pulleys for cooling; C & P has none. Keystone uses a venturi dryer, C & P does not. C & P's crimper functions as a puller of strand from the water bath; Keystone uses other means for that purpose. C & P uses a flying knife cutter, Keystone uses a drum type cutter. C & P extrudes four or six strands; Keystone extrudes five or seven, etc.

50. The Court also finds that the line ultimately built by Carey Plastic, which was claimed to have been copied from Keystone and in turn copied by C & P, differs again from *both* Keystone's and C & P's lines. Dr. Horton whose company bought the Carey Plastic line in 1967 or 1968 (Tr. 1427), testified that the Carey line extruded downwardly (Tr. 1431), used three roller godets without any fourth roller, whether for snubbing or flattening (Tr. 1438); had no annealing oven (Tr. 1442); extruded only two strands, had a *round* tubular orienting oven, etc.

51. Further, the information for building such lines was available to the trade. For example, Mundy obtained the information from each of two raw material suppliers, Enjay and Dow (Tr. 1499) and he built a similar line at Lejerbe in a short period of time in 1964 (Tr. 1511–1524) which line still produces oriented polypropylene street sweeper bristles (English Tr. 1850–1851). Eagle testified as to the availability of the necessary information and equipment to Enjay's customers at its sales laboratory and to the fact that he gave such information to Gould and that Gould visited Enjay's laboratory prior to 1962 (Eagle deposition, EX. M, pp. 23–40). Skenkman testified that he could put together a similar line within three months using available equipment and trade knowledge (EX. M). Consequently, the Court finds that Keystone's line and process were not a trade secret, the relevant information being known to the art, and furthermore, it was not used by C & P.

52. *Claimed Trade Secret No. 12* is imparting additional heat to the strand as it passes through the second oven (Gould Tr. 427). Gould does not know how much additional heat is imparted (Tr. 427), but he contends that it is imparted at a temperature greater than 800 degrees Fahrenheit (Tr. 428), this being greater than conventional annealing heat. He admits that annealing was earlier known and is not his trade secret (Tr. 429) and that one who uses annealing is not using his trade secret (Tr. 435). The Court finds that that is exactly what C & P does: it anneals at about 300 degrees Fahrenheit (Archer Tr. 1212; Polnau Tr. 689; King Tr. 813, 816) and therefore does not use this alleged trade secret.

53. Moreover this claimed trade secret was published by Gould in 1964 in his Canadian patent (e. g., see EX. A, Tab 79, p. 3, lines 10–32, p. 6, lines 24–32), as was admitted by Plaintiff in its Pre-Trial Answer dated June 23, 1971 to Defendant's Interrogatory No. 4 of June 6, 1970. Hence, the Court finds this was not a trade secret, secrecy having been relinquished by Plaintiff's own publication.

54. *Claimed Trade Secret No. 13* is the use of rags to dry the strand coming out of the first waterbath (Gould Tr. 442). The use of rags for this purpose, was well known to and commonly used in the art before 1964 (Archer Tr. 1213; Mundy Tr. 1522–1523; Cook Tr. 1115). This common expedient hardly qualifies as a trade secret; the Court finds it was not.

55. *Claimed Trade Secret No. 14* is the use of a flying knife cutter (Gould 118, 119). Witness after witness testified that this was a common and commercially available type of cutter, which has been known and commonly used in the extrusion art for years, including for the cutting of polypropylene (Kovach, Tr. 382; Archer Tr. 1197–98; Mundy Tr. 1519–1520; Horton Tr. 1442, 1482; Cook Tr. 1117). Moreover, Keystone itself does not use a flying knife cutter, but rather, uses a double roller or drum type cutter (Kovach Tr. 382), which the Goulds saw used at Roadmaster during their visits from 1954 to 1962 (Cook, Tr. 1080). Consequently, the Court finds that this was not a trade secret of Keystone.

56. Summarizing the claimed trade secrets, the Court finds that there were none. All were commonly known and used in the art. Secrecy of many were voluntarily relinquished, by Gould's own publication of them long prior to any alleged taking by Defendants.

## PATENT NO. 3,216,038 (TREATED CENTER)

57. According to Mr. Gould, his invention of the Gould Patent No. 3,216,-038 (EX. 3) was to treat the center of a bristle in some way (e. g., by crushing) so that it is weakened at its center and becomes more bendable where weakened (Tr. 486). Gould admitted on cross-examination, that it was a well known technique to weaken or otherwise treat various articles to make them more predisposed to bend at the treated location (Tr. 490). Examples of the use of this technique, about which he testified, included creasing of the Court Reporter's stenotype machine tape to make it more bendable at the crease, scoring a cardboard box blank for bendability, partially prebending metal bristles (e. g., see EX. A, Tab 50; EX. C, Patent Chart No. 9), partially prebending plastic bristles (e. g., see EX. C, Chart No. 10, EX. A, Tab 30), heating a plastic sheet along a line for easier bending (e. g., see EX. C, Chart No. 14; EX. A, Tab 4), spatulating or flattening a tubular shaped bristle

for greater bendability where flattened (e. g., see EX. C, Chart No. 12; EX. A, Tab 41), corrugating a drinking straw (e. g., see EX. C, Chart No. 18, EX. A, Tab 6), thinning the center of a piece of plastic to form a hinge (EX. C, Chart 20; EX. A, Tab 29), his own experiences in crushing natural fiber strands with pliers to make them more bendable where crushed in the process of making baskets (e. g., EX. C, Chart 13; Tab 71, Boy Scout Basketry Merit Badge Pamphlet), etc. In each instance, Gould admitted that the technique was old and that the article treated was made more bendable at the place treated, that being the purpose of the treatment.

58. Claims 1, 2, 3 and 5-in-suit of the Gould Patent No. 3,216,038 claim the invention as stress relieving the center of a conventional linearly oriented bristle made of nylon or polypropylene or other plastic material (see Col. 3, lines 57–58) for greater bendability at the center. Stress relief is defined in the patent as treating or weakening the bristle center portions in any one of a variety of ways, such as:

(a) by heating (Col. 1, lines 60–61); or

(b) by compressive deformation (Col 2, lines 5–6; Col. 5, line 53), using suitable pressure tools (Col. 2, line 9) or dies or rolls (Col. 5, line 54), with the bristle center being either cold or heated (Col. 5, lines 71–73); or

(c) by crushing (Col. 5, line 53); or

(d) by corrugating (Col. 5, line 55); or

(e) by prebending into a V-shape (Col. 5, lines 24–41, see Figs. 6 and 7).

59. As testified to by Archer, and as illustrated in his charts (EX. C, Nos. 7–20), the prior art is replete with examples of the common technique of treating various things to make them more bendable at the place treated. Among these examples are included the prebending of both nylon plastic and metal bristles, disclosed in Bible Patent No. 2,634,167 of

1953 (Chart No. 11, and EX. A, Tab 17) and the prebending of "plastic material", natural "vegetable" or metal bristles disclosed in Lechene Patent No. 3,023,441 of 1962 (Chart No. 10; also see EX. A, Tab 30).

60. *"Obviousness"*: This Court finds that the invention claimed in the Gould Patent No. 3,216,038 was taught by the prior art and therefore was "obvious" to those skilled in the art at the time the alleged invention was made. Such obviousness was corroborated by the testimony of engineer Eagle who testified that the application of heat, one of the treatments described in the patent, was natural to those skilled in the art and was suggested by him to Roadmaster and used by Roadmaster upon his suggestion (see EX. M, pp. 47–49). Obviousness was also corroborated by engineer Wehrenberg who testified that it would have been obvious at the time of the alleged invention to make the plastic bristle centers more bendable by crushing them with a heated blade (see EX. M, pp. 63–66). Thus, the patent claims-in-suit are invalid. Graham v. John Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed. 2d 345 (1965). Treating the centers of bristles produced no unexpected results or functions, different than taught by the prior art for the same purpose. Great A & P Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162 (1950).

61. In addition, the subject matter defined in Claim 1 of the patent is anticipated by, and the remaining claims in suit do not patentably distinguish from, the disclosures of the above Bible and Lechene prior art patents, each of which clearly disclose one of the treatment ways of the Gould patent, namely, prebending a plastic bristle into a V-shape to make it more bendable at the center. Neither of these two prior art patents were cited by the Patent Office. Thus, these claims are invalid for lack of patentable novelty, as well as for obviousness over these two prior art patents (35 U.S.C. §§ 102, 103).

62. *Non-Infringement of Patent No. 3,216,038*: Plaintiff claims that C & P's mats infringe the '038 patent.[2] Such mats are made of bristles aligned side-by-side to form a sheet which is held together by wire threads woven through the center. The wire threads are embedded into the plastic bristles by means of a heated roller which softens the bristle centers and presses the wire into them (Polnau Tr. 630–631). Defendants' mats are made generally in accordance with the description shown in the old British patent to Grosslaub No. 7536 of 1915, with the exception that the Defendant embeds his wire threads into the bristles rather than sewing them in, as is disclosed in this old British patent (see EX. C, Chart No. 21). Thus, to the extent that Defendants "treat" the centers of the mat bristles, the primary purpose of the treatment is to assemble the bristles into a mat. Any weakening of the bristle centers and any increased bendability of the bristles in the mat is only a by-product of the assembly operation (Polnau Tr. 634). Defendant only incidentally obtains the patented result. This is not an intentional infringement or use of the patented invention.

63. Thus, the Court finds that Defendants have not infringed the claims of Patent No. 3,216,038. While the patent claims may be literally construed to describe the weakened centers of the bristles of Defendants' mats, the principle of Defendants' product is different from and does not embody the spirit or intent of the claimed invention. Better bendability here is only incidental to the primary purpose of assembling the wires and the bristles into mats, and therefore there is no infringement. Westinghouse v. Boyden, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1897).

64. *Prior Use by Newark Brush*: At least as early as 1961, more than one year before the filing of the application of Patent No. 3,216,038, the subject matter thereof was in commercial use at Newark Brush Company in Kenilworth, New

2. Plaintiff admitted that C & P's loose bristle does not infringe, having no center treatment.

Jersey. The testimony of Dr. Horton, President of Newark Brush, was fully corroborated by the deposition testimony of Berry (EX. L) and an engineering drawing (EX. J) dated September 15, 1961 (Tr. 1415). This testimony shows that Newark Brush utilized a press having a blade and a V-shaped anvil between which plastic bristles were placed, so that their centers were deformed or weakened or crushed. The bristles were prebent into a V-shape, for easier bending during assembly into a brush. In addition, the bristle centers were heated by steam during the press operation to soften the bristle centers and permit them to distort. Bristles so treated were more easily bendable at the center, which was the purpose of the treatment (Tr. 1415–1417).

65. Earlier, Newark Brush had used similar bending presses to prebend and weaken the centers of various types of bristles, including mental bristles, nylon bristles, and oriented polypropylene street sweeper bristles (Tr. 1415, 1423). Photographs of Newark Brush's press equipment were received in evidence (see photos, EX. I, and EX. B–1, B–2 and B–3, attached to Berry deposition, EX. L). Significantly, Newark Brush's employee Grambor helped in the development of Newark Brush's equipment used for treating the centers of nylon bristles (Tr. 1425–1426). That was prior to the time, i. e., January, 1961, that Grambor was employed by Keystone.

66. The Newark Brush treated bristles were fabricated into brushes, including street sweeper brushes, which were commercially sold, so that the Newark Brush use was a prior public or commercial use. Therefore, the Court finds that the invention claimed in Gould Patent No. 3,216,038 was anticipated by the prior commercial or prior public use at Newark Brush Company, more than one year before the patent application filing date and that therefore, the patent is invalid (35 U.S.C. § 102(b)).

67. *Prior Public Use by Roadmaster*: From 1959 until a short time after its owner Jesse Harr died in January 1962, Roadmaster Brush Company of Union, New Jersey, manufactured and sold street sweeper brushes made of wire bristles and of oriented polypropylene bristles. (Cook Tr. 1095; Eagle, EX. M, pp. 7–8.) Both the wire and the polypropylene bristles were treated at their centers to make them more bendable for brush assembly. The treatment consisted of placing a bundle of bristles in a press between a blade and a V-shaped block. Operation of the press caused the blade to strike the centers of the bristles, forcing them into the block, so as to prebend them into a V-shape. In the case of polypropylene bristles, their centers were crushed and deformed by the blade, making them more bendable (Cook Tr. 1082–1092, 1175A–1176; Barry Cook deposition EX. M, pp. 8–9). All of this was more than one year before the filing date of the patent application which became the Gould Patent No. 3,216,038.

68. Roadmaster was a customer of Keystone, having purchased polypropylene bristles from Keystone. For a time it was also a neighbor of Keystone, which was then located two doors down from Roadmaster's shop. Mr. & Mrs. Gould visited Roadmaster on numerous occasions over the years, as did Stanley Grambor, Keystone's Vice President. They were shown and they observed Roadmaster's center treating operation. Grambor admitted (Tr. 1025) that he saw the center treatment of wire bristles. Moreover, he was also shown Roadmaster's operation of prebending and crushing the centers of the plastic bristles by Cook (Tr. 1101) and Grambor personally tried out and operated Roadmaster's press (Cook Tr. 1181–1182). According to Grambor, both Mr. & Mrs. Gould knew how Roadmaster made its plastic street sweeper brushes (Tr. 1052–1053).

69. Both Mr. & Mrs. Gould observed the Roadmaster press operation performed on plastic bristles on a number of occasions, e. g., at and prior to February 1962 (Cook Tr. 1106). They also were specifically shown the press bristle center treating operation by Cook shortly

after Roadmaster's owner died in January 1962, at which time the Goulds (having received an offer of sale of Roadmaster's plant) were shown every piece of equipment and every operation in the place (Cook Tr. 1106; Gould Tr. 536). All of this was more than one year before the filing date of the patent-in-suit. Significantly, at Trial, Gould admitted the Roadmaster prior commercial use of the center treating of the bristles. He admitted that he observed Roadmaster's press operation and saw the press plunger contact the centers of the bristles and drive them into a socket, resulting in the bristles being prebent into a V-shape, thus making them more easily bendable at the prebent centers (Gould Tr. 540–546). This same technique of prebending the brisles into a V-shape is illustrated (Fig. 6) and described (Col. 2, lines 20–26) in Gould's patent and purported by him to be one form or "modification" of his claimed inventive center treatment. Thus, the Court finds that Keystone, and more specifically, Gould, knew of the prior use of the claimed invention at Roadmaster more than one year prior to the patent filing date.

70. The Trial admissions of Gould, coupled with the corroborated testimony of Cook and his brother Barry Cook, as well as the admissions of Keystone's Vice President Grambor, amply demonstrate a prior commercial or public use of the patented invention at Roadmaster, antedating the patent application filing date by more than one year. Therefore, the Court finds the patent invalid for this reason (36 U.S.C. § 102(b)). Further the Court finds that the Goulds filed for and obtained Patent No. 3,216,038 after they had specific knowledge of the anticipatory prior public use of their claimed invention by Roadmaster Brush Co.

## PATENT NO. 3,330,721 (REMELT SURFACE)

71. Gould Patent No. 3,330,721 (EX. 4) claims as its invention the forming of a homogeneous remelted surface upon the prior art fibrous linearly oriented polypropylene filament. The patent claims describe the allegedly novel re- melted surface as: "A solidified, homogeneous remelt of substantial depth inwardly from the surface." (Gould Tr. 471.) The stated purpose of this remelt is to provide greater split resistance and abrasion resistance.

72. As background, the patent specification explains that prior to this invention, the homogeneous plastic filaments produced by extruding and then quenching, were transformed into a fibrous filament by an orientation step performed by stretching the filament between drafting rolls or godets as the filament passes through a heated oven (EX. 4, Col. 1, lines 60–72). Thereafter, the oriented filament was heated in a second oven at a temperature below its melting temperature to relax internal stresses (called annealing) and to set the strand (Col. 2, lines 32–37). The proofs here show that this prior art practice is the same practice followed by C & P (Polnau Tr. 689).

73. The patent describes the process for obtaining the allegedly inventive remelted surface as follows: As above, the plastic is extruded molten and quenched in a water bath, at which stage it is "homogeneous throughout". Thereafter the filament is heated and stretched or linearly oriented so that it is fibrous, including at its surface (Col. 3, lines 15–41). Thereafter the filament is reheated in a second oven at a temperature "suitable for melting the surface area of the filament" (Col. 3, lines 48–52), such as "of the order of 900 degrees Fahrenheit to 1400 degrees Fahrenheit (Col. 3, line 56). "The melted surface area is solidified by . . . (quenching) . . . into a homogeneous non-fibrous casing which through remelting and solidification . . . connects the (previously) oriented and weakened surface fibers into a smooth, homogeneous non-fibrous, non-oriented and split-resistant casing integrally fused with the fibrous highly oriented body or core" (Col. 3, lines 54–64).

74. *Non-Infringement of Patent No. 3,330,721*: The Court finds that Plaintiff has failed to sustain its burden of

proving infringement by Defendants' bristles. In fact, Plaintiff offered no effective proofs as to infringement. It offered no testimony or other evidence to in any way demonstrate that C & P's bristles have a remelted surface. Plaintiff's expert, Dr. Stark, had not even examined one of the Defendants' bristles (Tr. 1738–1739), and he testified that he did not know whether C & P's bristle surfaces are remelted or annealed (Tr. 1744, 1745). The Court finds that they are annealed, not remelted, and therefore there is no infringement.

75. The Court rejects entirely Dr. Spark's answer (on Tr. 1718–1719) to a hypothetical question (on Tr. 1711–1713) regarding whether processing under certain enumerated extrusion line conditions would produce a remelted surface. First, the patent-in-suit is for a bristle (Gould Tr. 459) not for a process of making bristle. The process is the subject of a different Gould patent (Gould, Tr. 462–466; EX. F, Gould Patent No. 3,217,074) which is not involved in this suit. Second, as to whether the Defendants' bristle does or does not have a remelted surface, Sparks testified: (Tr. 1744) "I don't know whether it is remelted or annealed" and (Tr. 1745) ". . . I don't know whether it is remelting or annealing, or what it is." Third, having observed his demeanor, as well as admissions that his testimony is based upon hearsay, and he never even examined Defendants' bristles, the Court rejects his testimony. Fourth, Gould testified that he has no way of determining from a bristle whether its surface is remelted (Tr. 477–479). His only test is to whip a bristle against a hard surface to see if it splits (Gould Tr. 433, 474); but he admitted that "good" bristles made other ways (i. e., without a remelted surface) will also pass that test (Gould Tr. 474–476). Accordingly, the Court does not accept that as a test to demonstrate the presence of the claimed remelt surface "in the form of a solidified homogeneous remelt of the filament of substantial depth" (see Claims 1 and 4, Col. 6, EX. 4). In short, this Court finds that plaintiff had no effective evidence of infringement.

76. Defendants offered proofs demonstrating that the surfaces of their bristles are not remelted, are not reheated to above their melting temperatures, are not homogeneous, and in fact, are fibrous or oriented (Polnau Tr. 689; Archer Tr. 1235). Both Archer and Polnau demonstrated to the Court that C & P's bristle surfaces are fibrous, not homogeneous, by simply peeling off fibers from the surface (Polnau Tr. 689; Archer Tr. 1235). The "remelt" patent is inapplicable to Defendants' bristle which is simply annealed, non-homogeneous and fibrous at its surface, as in the prior art. Hence, this Court finds that Defendants do not utilize the claimed invention, and therefore do not infringe Patent No. 3,330,721.

## ANTI–TRUST COUNT

77. In the middle of the Trial, at the outset of offering proofs relating to its antitrust count, Plaintiff endeavored to change drastically the nature and scope of its Anti-Trust complaint, which would correspondingly have changed the nature and scope of Plaintiff's proofs as well as the defenses and proofs to be offered by the Defendants. Since such change was not practical under the circumstances, in fairness to Plaintiff, as well as in fairness to Defendants, the Court ordered the Anti-Trust Count severed forthwith, with the Count to be dismissed without prejudice to Plaintiff's right to file a new suit, with a new complaint, on the contended Anti-Trust claims, and likewise, without prejudice to Defendants' rights to counterclaim thereto. Hence, no further Findings are made with respect to this Count and the final order in this suit shall reflect dismissal of this Count without prejudice.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action.

*Trade Secret Count:*

2. Plaintiff has the burden of establishing (a) that it has trade secrets,

(b) which were improperly acquired by Defendants through a breach of confidential relationship, and (c) that Defendants have in fact used such improperly acquired secrets. Cataphote Corp. v. Hudson, 444 F.2d 1313 (5th Cir., 1971). Plaintiff has failed to sustain that burden of proof.

3. Trade secrets are defined in the Restatement of Torts (see Section 757 and also comment (b), as information (1) which is used in one's business, (2) which gives him an opportunity to obtain an advantage over competitors who do not know or use it, (3) which is secret, i. e., not common knowledge of the trade, (4) which is maintained in secrecy by the owner, (5) which is of value to a competitor, and (6) which was acquired at some expense to or effort by its owner. Forest Laboratories v. Pillsbury Co., 452 F.2d 621 (7th Cir., 1971). While such secret need not be novel or inventive in a patentable sense, it must "possess at least that modicum of originality which will separate it from everyday knowledge" and must be more than "ordinary mechanical commonality". Cataphote Corp. v. Hudson, supra, 444 F.2d at p. 1315.

4. Essential to this suit is the element of secrecy. "The subject matter of a trade secret must be secret. An item or process of public or general knowledge in an industry cannot be appropriated by one as his own secret". Cataphote v. Hudson, supra. "Federal law requires, that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent", Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969); or are otherwise bona fide trade secrets. Cataphote v. Hudson, supra.

5. Having itself published many of its claimed trade secrets in its 1964 Canadian patent, long prior to any alleged taking by Defendants, Plaintiff voluntarily relinquished its claim to such secrets. The "element of secrecy evaporated with the issuance of the patent". Forest Laboratories v. Pillsbury, supra. Thus, Defendants are not liable as to any of the claimed trade secrets found in Plaintiff's Canadian patent.

6. All of the alleged trade secrets having been found to be public or general or common knowledge of the trade prior to the time of the alleged taking, these cannot be appropriated by Plaintiff as its property. Cataphote v. Hudson, supra. Thus, Defendants are not liable.

7. The Court having found that Defendants independently produced their own extrusion line, using no information derived from Plaintiff, there was no use by Defendants of any alleged trade secrets of Plaintiff. Hence, Defendants are not liable.

8. There being no evidence that Defendants either had or breached any confidential relationships with Plaintiff, there is no liability to Plaintiff.

*Patent Infringement Count:*

(a) *Patent No. 3,216,038:*

9. Claims 1, 2, 3 and 5-in-suit of Plaintiff's Patent No. 3,216,038, issued November 9, 1965 are invalid for "obviousness" (35 U.S.C. § 103), for lack of novelty (35 U.S.C. § 102), and for "prior public use" (35 U.S.C. § 102).

10. As stated in Waldon Inc. v. Alexander Manufacturing Co., 423 F.2d 91 (5th Cir., 1970):

"In order to be patentable a device must be useful, novel, and non-obvious in light of the prior art. 35 U.S.C.A. §§ 101–103; Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 . . . ; Zero Manufacturing Company v. Mississippi Milk Producers Association, 5 Cir., 1966, 358 F.2d 853. The question of non-obviousness under 35 U.S.C.A. § 103 involves factual determination of what the prior art was; what, if any, improvements the patentee has made over the prior art; and the level of ordinary skill in the [prior] art. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 1969, 396 U.S. 57, 90 S.Ct. 305, 24 L. Ed.2d 258; Graham v. John Deere Co., supra . . . From these factual

findings the legal determination of whether the improvement would have been obvious to a person with ordinary skill in the art is made."

11. Having found as a fact that the alleged patentable improvement is the application to a plastic bristle of the old, well known and widely used techniques of locally treating various objects, including plastic bristles, in order to make them more bendable where treated, and having found as a fact that this technique was known and used by the art and was within the level of skill of the art, the Court concludes that the subject matter of Patent No. 3,216,038 was "obvious" and therefore the patent is invalid (35 U.S.C. § 103).

12. In addition, having found as a fact that such subject matter lacked novelty over certain of the prior art patents which disclosed the center treatment of plastic bristles, the patent is invalid for lack of novelty.

13. Moreover, the patent is invalid under 35 U.S.C. § 102(b) because the subject matter thereof was in "prior public use" at Newark Brush Company more than one year before the date of filing of the patent application. Strong v. General Electric Co., 434 F.2d 1042 (5th Cir., 1970).

14. Further, the patent is additionally invalid under 35 U.S.C. § 102(b) because the subject matter thereof was in prior public use at Roadmaster Brush Company more than one year before the date of filing of the patent application. Strong v. General Electric Co., *supra*.

15. The claims of Patent No. 3,216,038 are not infringed by Defendants. The center treatment of Defendants' bristles is confined to Defendants' process of embedding woven wires into the bristles in order to assemble mats. Whatever resultant weakening or increased bendability occurs is a by-product of the mat making process and is not utilized for the same purpose as the patented center treatment. As stated in Marvin Glass & Associates v. Sears Roebuck and Company, 448 F.2d 60 (5th Cir., 1971):

"The rule in this Circuit is that patent claims are only a starting point. The claim of a patent must be read in the light of the invention disclosed and cannot be given a construction broader than the teachings of the patent as shown by the drawings and specifications."

\*    \*    \*    \*    \*    \*

"Moreover, the rule in this Circuit that courts must look beyond the literal meaning of the patent claims is applied even more strictly to combination patents."

16. Thus, there can be no infringement where Defendants use is for a different purpose or principle, and where literal infringement, if any, is only an incidental by-product. Westinghouse v. Boyden, 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136 (1897), aptly states:

"The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principal of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent."

(b) *Patent No. 3,330,721:*

17. Defendants have not infringed the claims of Patent No. 3,330,-721. Plaintiff has not sustained its burden of proving infringement, since Plaintiff did not prove that Defendants' bristles have the claimed remelted homogeneous surface. To the contrary, Defendants demonstrated to the Court that its bristle surfaces are fibrous, not homogeneous. Further, Defendants closely

follow the prior art practices acknowledged in the disclosure of Plaintiff's own Patent No. 3,330,721.

## ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered and adjudged:

1. Claims 1, 2, 3 and 5-in-suit of Plaintiff's Gould Patent No. 3,216,038 issued November 9, 1965, relating to Synthetic Plastic Broom Bristles, are invalid and are not infringed by Defendants.

2. Plaintiff's Gould Patent 3,330,-721 issued July 11, 1967, relating to Synthetic Filaments and the Claims thereof is not infringed by Defendants.

3. Defendants are not liable to Plaintiff under Plaintiff's claim of misappropriation of trade secrets.

4. Each of the parties shall return to the other the copies of business records, such as invoices, sales documents, tax returns and the like, which were furnished to it by its adverse party during discovery, with the documents returned to include any copies made of the copies furnished. However, respective counsel may keep lists identifying the documents returned, such lists to be maintained in confidence by counsel.

5. The complaint herein is dismissed with prejudice, except that the dismissal of the antitrust count of the complaint is hereby dismissed without prejudice, with costs awarded to defendants.

6. Defendants shall submit to the Court, within five (5) days an itemized and verified statement of its costs incurred in connection with defense of this litigation. Plaintiff may submit its objections, if any, to the cost items, within three days thereafter, following which the clerk shall determine the amount awarded.