**TRANSCO PRODUCTS INC., Plaintiff,**

v.

**PERFORMANCE CONTRACTING, INC. and Performance Contracting Group, Inc., Defendants.**

No. 89 C 8001.

United States District Court, N.D. Illinois.

Jan. 28, 1993.

the jury and to protect the deliberative process from unwarranted scrutiny.

Robert E. Wagner, Roger H. Stein, Wallenstein Wagner & Hattis, Chicago, IL, for plaintiff.

Charles S. Bergen, Darrell J. Graham, Jay R. Hoffman, Grippo & Elden, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Transco Products Inc. ("Transco") has sued Performance Contracting, Inc. and Performance Contracting Group, Inc. (collectively "Performance Contracting," treated as a singular noun):

1. seeking a declaratory judgment of invalidity, noninfringement and unenforceability of United States Patent No. 4,009,735 (the "Pinsky patent") owned by Performance Contracting, and

2. charging Performance Contracting with infringement of Transco's United States Patent No. 3,941,159 (the "Toll patent").

In response Performance Contracting has counterclaimed, seeking a declaratory judgment of invalidity and unenforceability of the Toll patent and charging Transco with infringement of the Pinsky patent.

This Court's May 12, 1992 memorandum opinion and order (the "Opinion," 792 F.Supp. 594[1]) dealt with a double-faceted summary judgment motion under Fed. R.Civ.P. ("Rule") 56 by Performance Contracting:

1. It denied the motion for summary judgment on the issue of the invalidity of the Toll Patent.

2. It granted the motion for summary judgment declaring Performance Contracting's noninfringement of the Toll patent.

Now Transco has moved for partial summary judgment under Rule 56 on the issue of noninfringement of the Pinsky patent, and Performance Contracting has filed a cross-motion for summary judgment on the same issue, asking this Court to rule summarily that Transco's several products[2] infringe the Pinsky patent. For the reasons stated in this memorandum opinion and order, both motions are denied.

### Rule 56 Standards

Rule 56 principles impose on any movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) (citations omitted)). Where as here cross-motions are involved, that principle thus demands a dual perspective—one that this Court has described as Janus-like—that sometimes involves the denial of both motions.

This District Court's General Rules 12(M) and 12(N) require factual statements in support of and in opposition to Rule 56 motions, and both sides have tendered such statements. References to Transco's statement in support of its motion are cited "P. 12(M) ¶ —," to Performance Contracting's responsive statement are cited "D. 12(N) ¶ —," to Performance Contracting's statement in support of its cross-motion are cited "D. 12(M) ¶ —" and to Transco's re-

---

1. All citations to the Opinion will simply take the form "Opinion at —," listing the page number but omitting the F.Supp. volume number.

2. As will soon become evident, Performance Contracting has identified five Transco con-

structions. It claims that each of them infringes the Pinsky patent.

sponsive statement are cited "P. 12(N) ¶ —." [3]

## Facts

On October 2, 1974 Gordon Pinsky ("Pinsky") filed a continuation of his original October 24, 1973 application with the United States Patent Office covering a pipe insulation design (P. 12(M), D. 12(N) ¶¶ 4, 5). On March 1, 1977 the Pinsky "Thermal Insulation" patent (the "Pinsky patent") issued, containing these four claims (P.Ex. 1, col. 4):

1. Readily removable and replaceable rewettable thermal insulation for use on vessels and piping within reactor containment areas of nuclear power plants comprising high temperature resistant mineral fiber or glass fiber encapsulated within rewettable, high temperature resistant, asbestos free glass cloth held in place with a plurality of spaced quick release and engage fasteners, wherein the glass cloth can withstand repeated wettings from spray systems within the reactor containment areas of nuclear power plants and wherein the fasteners are two woven nylon, hook and loop mating strips, wherein the glass cloth has a finish of a leachable, organic silicate carried in a fatty and mineral oil vehicle.

2. Thermal insulation according to claim 1 wherein the encapsulated fiber is a fine fiber and is in the form of tangled or felted mats.

3. Thermal insulation according to claim 2 wherein the mats are quilted.

4. Thermal insulation according to claim 1 wherein the strips comprise a hook strip covered with stiff little hooks and a loop strip covered with tiny, soft loops.

Transco began marketing blanket-type insulation for nuclear power plant containment areas as early as 1982 (D.Ex. M). In three letters dated February 13, March 8 and September 11, 1989, Performance Contracting notified Transco that it believed Transco was infringing the Pinsky patent (Complaint Exs. B, C, D). Transco's own nuclear reaction was to file its October 25, 1989 Complaint seeking a declaration of its rights in this action.

Performance Contracting has identified five Transco constructions for purposes of this motion (D. 12(M) ¶ 32, D.Mem. 5): (1) Drawing No. SK–TW–01 (the "TA construction") (P.Ex. A) [4]; (2) a construction allegedly used at Arkansas Nuclear Power Plant (the "A construction") (D.Ex. A); (3) a configuration allegedly used at Millstone Nuclear Power Plant (the "MA Construction") (D.Exs. B, C, F through I, M; (4) a second construction allegedly used at Millstone (the "MB construction") (D.Exs. I, M, N) and (5) a generic construction (the "G construction") (D.Ex. J). Performance Contracting claims that all five constructions infringe the Pinsky patent either literally or under the doctrine of equivalents (D.Mem. 5).

## Noninfringement

■ To establish infringement by any Transco construction, Performance Contracting must show by a preponderance of the evidence that every limitation in a claim is incorporated either literally or by a substantial equivalent in that Transco construction (*Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir.1991)). [5] Literal infringement of a claim requires a showing that each claim element of the Pinsky patent is matched exactly by a correspond-

---

3. To avoid confusion, the parties have begun the numbering in D. 12(M) and P. 12(N) where the numbering in P. 12(M) and D. 12(N) left off.

4. For consistency's sake, this opinion has adopted the abbreviations used by Performance Contracting.

5. Although this opinion speaks consistently of what a party must "show" or must "prove" (the language employed in the substantive case law), it is always necessary to keep in mind the special meaning that such terms have in the context of a summary judgment motion. To prevail Performance Contracting must rather demonstrate that even with a pro-Transco reading of the evidence (that is, with all reasonable inferences drawn in its favor), no material fact necessary to Performance Contracting's proof is in dispute. And for Transco to prevail it must demonstrate the flip side of that proposition: there are no disputed material facts, even with a pro-Performance Contracting reading of the evidence, that would block a legal holding of noninfringement.

ing Transco element (*Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed.Cir.1991)). Under the doctrine of equivalents a patent is viewed as infringed, even if not by its literal language, if the accused device "performs substantially the same function in substantially the same way to obtain the same result"—an inquiry frequently termed the function-way-result test (*Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)).

Performance Contracting asserts that the accused constructions infringe claims 1 and 4 [6] of the Pinsky patent (D.Mem. 5). Transco has endeavored to demonstrate (in both senses employed in n. 5) that its constructions do not infringe these claims on the following three limitations (P.Mem. 4–5):

 1. "a plurality of spaced quick release and engage fasteners;"

 2. "the fasteners are two woven nylon, hook and loop mating strips";

 3. "the glass cloth has a finish of a leachable organic silicate carried in a fatty and mineral oil vehicle."

Those limitations will be addressed in turn.[7]

*1. "A plurality of spaced quick release and engage fasteners".*

a. Literal Infringement

Transco's blankets employ hook and loop mating strips [8] that run parallel to the junction of the insulation—that is, lengthwise along the pipe being insulated (P.R.Mem. 13). When one of Transco's blankets is put around a pipe, the two side edges press against one another and a fabric flap with loops on one side overlaps and fastens to a strip with hooks sewn onto the other side (P. 12(M) ¶ 17). Although Performance Contracting's current Nukon® product employs the same system (see Opinion at 597), Transco argues that because the drawing submitted with the Pinsky patent application showed fastener strips that ran perpendicular to the junction of the insulation (P.Ex. 1, shown as Appendix 1 to this opinion), Claim 1 is limited to fasteners that traverse the junction of the insulation (P. 12(M) ¶ 19).

Performance Contracting admits that the words of Claim 1, "a plurality of spaced quick release and engage fasteners," describe "more than one fastener with each fastener having at least two components" (D. 12(N) ¶ 12). But it contends that the drawings cannot be used to limit the scope of its claim to fasteners that traverse the junction of the insulation (D.Mem. 7).

■ Generally references to a preferred embodiment, such as those in the specification or drawings, are not claim limitations (*Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed.Cir.1988); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed.Cir.1983)). Obviously an inventor need not disclose in a patent application

---

**6.** Because claim 4 is dependent on Claim 1, Claim 4 cannot be found infringed unless Claim 1 is found infringed (*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 685 (Fed.Cir.1990)). Hence this opinion focuses its discussion on Claim 1.

**7.** Transco's R.Mem. 5 contains a brief section captioned "There Are Other Limitations in the *Pinsky* Patent at Issue, But Not in the Present Motions." That concept of holding back in response to a potentially dispositive motion for summary judgment is impermissible, just as no court would tolerate an argument by a litigant who has lost at trial that the litigant has other reasons that the other party should not have prevailed (see, e.g., this Court's opinion in *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), aff'd and adopted as our Court of Appeal's opinion, 736

F.2d 388, 393 (7th Cir.1984), quoted and approved in rejecting a similar holding back in *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985)). It was *Transco* that launched the current summary judgment procedure by its motion seeking a declaration of noninfringement and identifying the three limitations in the Pinsky patent as not present in its own constructions. It has had its day in court, and it will not now be permitted to assert other distinctions between the teaching of the Pinsky patent and its own constructions.

**8.** Such strips are best known by the brand name Velcro®. Although Performance Contracting claims to use Velcro® brand quick release and engage fasteners, Transco describes its strips in generic language only.

every embodiment of the invention that is covered by the patent claims (*SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121–22, 1139 (Fed.Cir.1985)).[9]

■ Here the language of Claim 1 now at issue (with the "fasteners" later described as "mating strips") makes no mention of the mating strips' direction relative to the junction of the insulation. Transco maintains that because the Pinsky patent was issued in a crowded field, its claims must be limited to the "specific structure described in the specifications and drawings" (P.R.Mem. 14). Numerous cases have indeed stated that claims in a crowded field should be given a narrow scope of equivalents (see *Slimfold Mfg. Co. v. Kinkead Indust., Inc.*, 932 F.2d 1453, 1457 (Fed.Cir.1991); *Universal Gym Equip., Inc. v. ERWA Exercise Equip., Ltd.*, 827 F.2d 1542, 1548 (Fed.Cir.1987)). But what Transco asks instead is to use the drawing to narrow the literal language of Claim 1— and that would contravene the widely cited teaching of *Laitram*, 863 F.2d at 865, *Raytheon*, 724 F.2d at 957 and similar cases.

■ Transco also argues that the word "spaced" is ambiguous and that the drawings must be used to construe its meaning (P.Mem. 11). When ambiguity is apparent in the language of a claim, resort may be had to the specification and drawings to determine the proper construction of the claim (*Stansbury v. Bond*, 482 F.2d 968, 974 (C.C.P.A.1973); *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed.Cir. 1991)). But the Federal Circuit has warned against adding "extraneous" limitations into claims (*E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.1988)). Although a court may use the specification to divine what the patentee meant by a word or phrase in the claim, "[w]here the specification does not *require* a limitation, that limitation should not be read from the specification into the claims" (*id.* (emphasis in original);

see also *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed.Cir.1985)).

*Unique Concepts* used the specifications and drawings to support a finding that the words "right angle corner pieces" in a patent for a framework for mounting a fabric sheet could not be read as literally encompassing "mitered linear border pieces." Thus the court looked to the specifications and drawings not to limit the language of the claim but to prevent an interpretation that would contravene the plain meaning of the claim. Similarly, *Cincinnati Milling Machine Co. v. Turchan*, 208 F.2d 222, 225 (6th Cir.1953) looked to the specification and drawings to define the vague term "means," thus confining what would otherwise be an excessive scope of the claim:

> [W]here the novelty that exists in a combination of elements set forth in the claim, resides in the means, the claim must be limited to such means as are disclosed and illustrated in the specification.

To fail to do so, the court explained, would in essence allow the inventor to "appropriate any and all kinds of mechanism which may perform the specified function or any other mechanism or device than that which is described in the patent or which is its mechanical equivalent" (*id.*).

■ Certainly the drawing submitted with the Pinsky patent can be resorted to as illustrative of the meaning of "spaced" (though that word poses no special difficulties in any event). But the drawing cannot be employed to create an unstated limitation of the claim to mating strips that cross the junction of the insulation rather than running parallel to it. As already stated, the claim makes no reference to the direction of the strips, and the Pinsky patent application specifically stated the truism that the drawing was an example and not the invention itself (P.Ex. 4 at T112) (see *Autogiro Co. of America v. United States*, 384 F.2d 391, 398, 181 Ct.Cl. 55 (1967)).[10]

---

9. Though that case split the Federal Circuit to the maximum (5 to 5, with one judge concurring), all of the judges agreed on the proposition stated in the text.

10. There the court stressed that although one embodiment of an invention does not restrict claims, where a "patentee describes an embodiment as being the invention itself and not only

Mating strips that traverse the junction at intervals and mating strips that run parallel to the junction but are noncontinuous can both be described accurately as "spaced." Again, though the drawing demonstrates one method of "spacing" mating strips, it is not the only imaginable one, and an inventor is not required to describe every possible embodiment in the application materials (*SRI Int'l*, 775 F.2d at 1121–22, 1139).

What of the other portion of the Claim 1 language now under scrutiny—"a plurality of spaced ... fasteners"? Performance Contracting admits that the Transco TA construction does not employ such a plurality (D. 12(N) ¶ 16; D. 12(M) ¶ 43), utilizing instead one continuous line of fastener. Performance Contracting's evidence shows that the other four Thermal Wrap embodiments (the A, MA, MB and G constructions) do have a plurality of spaced quick release and engage fasteners (D.Mem. 7; Pinsky Aff. ¶ 13, Hart Aff. ¶ 4, Gray Aff. ¶¶ 4, 5, D.Exs. C, F, J and N).

As to three of those four (A, MA and G), Transco has not countered Performance Contracting's evidence. Transco has rather attempted to explain *why* those constructions have more than one set of quick release and engage fasteners: to allow the insulation to go around an obstacle (P.R.Mem. 3). Thus although the line of the fastener is discontinuous at the point of the notch, Transco stresses that it is "nevertheless continuous along the abutting sides up to and immediately after the obstacles" (P.R.Mem. 3–5). That however demonstrates continuity of the insulating blanket apart from the fasteners, rather than of the fastener itself—something that is equally true of the Pinsky drawing (see App. 1 to this opinion). Hence Transco's explanation does not constitute evidence

that the three constructions do not have "a plurality of spaced quick release and engage fasteners." Performance Contracting has therefore demonstrated that the A, MA, and G constructions literally infringe the limitation of Claim 1, "a plurality of spaced quick release and engage fasteners."

Transco contends that in practice the MB construction, marketed under the name Spiral–Wrap®, is not exactly like that shown in Performance Contracting's Ex. N, which is merely a drawing. In practice, Transco claims, the MB construction "employs separate belts or straps or stainless steel tie wire locked by twisting," so that any quick release and engage fastener is used purely for cosmetic purposes (P.R.Mem. 3–4; Wolbert Aff. ¶ 5, P.Ex. 14).[11]

Performance Contracting admits that Transco has raised a genuine issue of fact as to whether the MB construction as drawn in Ex. N was ever actually employed by Transco (D.R.Mem. 5–6). Performance Contracting nonetheless urges this Court to grant summary judgment on the issue of infringement, allowing the issue of whether the MB construction was ever actually used to go to trial. However, actual production or preparation for production of an accused device is a prerequisite to the existence of a case or controversy between the parties (*Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 862 (Fed.Cir.1987)). As Performance Contracting itself has stated, if Transco did not use hook and loop fasteners in its product "there would be no lawsuit" (D.R.Mem. 10). Summary judgment cannot be granted on an issue that may not even be in dispute—that would amount to a verboten advisory opinion.

one way of utilizing it," then "such reference may be of value in claim interpretation."

**11.** Performance Contracting further contends that the evidence Transco has submitted on this point, the Wolbert affidavit, is merely "attorney argument" (D.R.Mem. 1–2) and that attorney Wolbert is not qualified to testify as an expert and hence cannot testify as to opinions or conclusions based upon fact. While Fed.R.Evid. 602 provides that a "witness may not testify to a

matter unless ... the witness has personal knowledge of the matter," Fed.R.Evid. 703 permits expert witnesses to testify as to opinions or conclusions. Here Wolbert's sworn statement as to the fastening systems on Transco products and as to the function of the fastening systems is not a matter of expert testimony but rather of personal knowledge, and hence his status as an expert is not at issue on this point.

### b. Infringement Under the Doctrine of Equivalents

Performance Contracting admits that the fastener in the remaining construction—the TA—does not read literally on the language "a plurality of spaced, quick release and engage fasteners" (D. 12(N) ¶ 16; D. 12(M) ¶ 43). Nonetheless Performance Contracting urges that the TA construction infringes the Pinsky patent under the doctrine of equivalents (D. 12(M) ¶ 44; D.Mem. at 15–16).

That doctrine "relieve[s] an inventor from a semantic strait jacket when equity requires" (*Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed.Cir.1987)). As the seminal decision in *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856 reconfirmed, the doctrine's underlying premise is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." And a host of cases since *Graver Tank* has continued to apply that concept (see, e.g., *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1325 (Fed.Cir.1991)).

Courts have accorded inventions a range of equivalents dependent upon the extent and nature of the invention (*Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed.Cir. 1986)). Performance Contracting contends that the Pinsky patent is a pioneer patent entitled to a broad range of equivalents (D.Mem. 14; D. 12(M) ¶ 41; Pinsky Aff. ¶ 4). Transco disputes that (P.R.Mem. 22–23; P. 12(N) ¶ 41, P.Ex. 21 at 18–19, P.Ex. 30 at 16–24, 29).[12]

*Westinghouse v. Boyden Power–Brake Co.*, 170 U.S. 537, 561–62, 18 S.Ct. 707, 718, 42 L.Ed. 1136 (1898) has defined "pioneer" in these terms:

> This word, although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before. Most conspicuous examples of such patents are the one to Howe, of the sewing machine; to Morse, of the electric telegraph; and to Bell, of the telephone.

Such "pioneer" inventions are accorded a wide range of equivalents, while mere improvements in crowded art are narrowly confined (*Brill v. Washington Ry. & Elec. Co.*, 215 U.S. 527, 532–33, 30 S.Ct. 177, 178–79, 54 L.Ed. 311 (1910); *Slimfold Mfg.*, 932 F.2d at 1457)). As *Perkin–Elmer*, 822 F.2d at 1532 has made clear, "[t]hat an improvement enjoys commercial success and has some industry impact, as many do, cannot compel a finding that an improvement falls within the pioneer category."

To support its contention that the Pinsky invention was a pioneer, Performance Contracting offered inventor Pinsky's own statement that the use of blanket-type insulation in nuclear power plants was resisted before his invention, and that where asbestos blankets were used they presented safety hazards and were difficult to fasten

---

**12.** Performance Contracting takes exception to Transco's use as evidence of the statement by attorney Pacella, who prepared and prosecuted the application for the Pinsky patent (D.Mem. 17). But the cases that Performance Contracting cites as support for rejecting the Pacella testimony (*In re Deters*, 515 F.2d 1152, 1155 (C.C.P.A.1975), *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1572–73 (Fed.Cir.1984) and *Keystone Plastics, Inc. v. C & P Plastics, Inc.*, 340 F.Supp. 55, 173 USPQ 395, 397 (S.D.Fla. 1972)) do not discredit the testimony of an attorney who prosecuted the actual patent in question—a process that one would think would require if not result in a degree of familiarity with the field in question. If nothing else, Pa-

cella's statement to Gordon Pinsky echoed the logical inference to be drawn from the Patent Office's repeated rejection of the Pinsky patent application as unoriginal in view of the prior art: that the field was crowded and that the invention did not represent a dramatic departure from the prior art (see P.Ex. 3 at T087, 094–095, 097, P.Ex. 4 at T127–28, T133, P.Ex. 5 at T164–65, 178–79, 181). On the other side of the coin, Transco has also cited its Ex. 22 ("Selected Data Sheets describing [Johns–Manville] Products for Industrial Insulations") in support of its position. Because there is no indication on the sheets that Transco has provided their date of publication, Ex. 22 is not useful support for Transco's position.

(Pinsky Aff. ¶¶ 2–6). According to Pinsky, since 1980 his blankets or their equivalent have been the insulation of choice in nuclear power plant containment areas (*id.* ¶ 4). On the other hand, Transco has presented evidence that asbestos cloth blankets had been used in nuclear power plant containment areas before the Pinsky patent application (P.Ex. 21 at 6, 18–19) and that JPS Glass Fabrics had developed glass wool to replace asbestos· in blanket-type insulation around 1960 (Waddington Dep. · 16–21, P.Ex. 11)). In addition, the prosecution history reflects a crowded field (see the record references to P.Exs. 3 and 4 in n. 12).

This opinion's need for a double perspective—alternatively drawing the inferences most favorable to one side and then to the other—leads to conferring ·pioneer status on the Pinsky patent for purposes of Transco's noninfringement argument and nonpioneer status for purposes of Performance Contracting's infringement argument. Fortunately that turns out to make no difference—for as the ensuing explanation shows, even under a narrow range of equivalents the TA construction is substantially equivalent to "a plurality of spaced, quick release and engage fasteners."

In the parties' argument on that subject, they have focused solely on the question whether fasteners that run parallel to the junction of the insulation are equivalent to fasteners that run perpendicularly to that junction (Hart Aff. 3, P.Ex. 13, Wolbert Aff. ¶¶ 11–12)). This opinion, though, has already held that fasteners in that first (parallel) category that are spaced to avoid an obstacle read *literally* on the limitation "a plurality of spaced, quick release and engage. fasteners." That shifts the issue under the doctrine of equivalents to whether one continuous fastener running parallel to the junction of the insulation is the substantial equivalent of a like parallel fastener that has spaces in it to avoid an obstacle

(and thus has "a plurality" of the fasteners themselves).

Obviously the function of the fastener in all events is to hold the blanket in place on the pipe. Both the continuous fastener of the TA construction and a plurality of spaced fasteners share the ease and security of the hook and loop fastener in doing just that. As for the results obtained, the two assemblies are substantially equivalent in that respect as well. Transco presented evidence, including Pinsky's statement, that fasteners running parallel to the junction of the insulation are particularly well protected from the heat of the pipe: There is no chance, as with fasteners that traverse the junction of the insulation, of a fastener's being exposed to heat from the pipe (Pinsky Dep. 61, P.Ex. 9; Wolbert Aff. ¶¶ 11–12, P.Ex. 13). · Spaced and·continuous fasteners that run parallel to the junction would be substantially· equivalent in that respect. Transco also argued that fasteners that traverse the junction of the insulation would insulate the pipe poorly because of the tendency of the fabric to buckle between the fasteners (Wolbert Affidavit ¶¶ 11–12, P.Ex. 13). In contrast, fasteners that run parallel to the junction, whether spaced or continuous, would offer substantially equivalent insulating performance. Indeed, having spaces in the line of the fastener rather than employing a single continuous fastener is plainly a matter of necessity rather than a desire for difference in performance.

In sum, in every pertinent respect a fastener that runs continuously along the length of a pipe is substantially similar in function, way and result to a like fastener that is spaced only to avoid an obstacle. Performance Contracting passes the *Graver Tank* test of equivalents to confirm infringement by the TA construction on the first element of Claim 1 challenged by Transco.[13] ·

**13.** Transco's R.Mem. 15–16 urges that a broad reading of the Pinsky patent to find equivalence in a single longitudinal fastener such as Transco's TA construction would cause Performance Contracting's claim to run afoul of the prior art. But that contention really goes to the *invalidity*

of the Pinsky patent under such a reading—something that highlights the general undesirability of a· partial approach (dealing with infringement but not validity) to a patent· dispute. Before issuing this opinion, this Court asked the parties to comment on whether such a partial

2. *"the fasteners are two woven nylon, hook and loop mating strips"*

■ Claim 1 of the Pinsky patent also says that "the fasteners are two woven nylon, hook and loop mating strips." Transco asserts that language limits the Pinsky patent to quick release and engage fasteners with *nylon* hooks, *nylon* loops and *nylon* mating strips (P.R.Mem. 19–20). Performance Contracting counters that the word "nylon" applies only to the term "mating strips," so that nylon mating strips with stainless steel hooks would be covered within the literal language of Claim 1 (D.Mem. 8 [14]).

One thing is certain: Claim 1 is scarcely a model of clarity. And neither the specification nor the prosecution history nails down (or, more appropriately in terms of the patent at issue, fastens down) whether Transco's or Performance Contracting's interpretation is assuredly the correct one. All that the specification states is that "[h]ook and loop tape fasteners made of nylon are preferred. High temperature resistant nylons generally are employed. The tape fasteners are woven and comprise two mating strips" (P.Ex. 4 at T112). As for the prosecution history, it refers to the differences between hook and loop fasteners and other fastening systems, but it is silent as to the material of the hook and loop fasteners.

On balance it would seem that Transco has substantially the better of the argument as to literal meaning. Separating "woven nylon" from "hook and loop mating strips" by a comma—a somewhat unusual usage—does suggest that the last-quoted term is intended to be a unitary description: mating strips *made up of* hooks and loops. That sensible reading is really confirmed not only by common sense (and incidentally by observation of how the ingenious Velcro® fasteners work) but also by the way in which Performance Contracting describes its device in the specification. It speaks of the fasteners as "hook and loop fasteners," then goes on to say that the fasteners "are woven and *comprise* [that is, are made up of] two mating strips." [15] What Performance Contracting fails to recognize by its argument is that if nylon does describe only "mating strip" and the strip "mates" only because of its two components—hooks and loops—the normal meaning conveyed by the language is that the two components have a nylon composition.

But once more it turns out to make no difference which side's version of that debate prevails. Even on Transco's reading

---

approach was appropriate here. Both answered "yes," but this opinion reflects that their answer may not have been the better one in more than one respect.

14. Performance Contracting there argues that all of the words preceding "mating strips" merely modify "mating strips" and nothing else. As Performance Contracting's memorandum puts it:

> Nylon doesn't modify "hook" or "loop," just as "hook" doesn't modify "loop," and "woven" doesn't modify "hook," and "two" doesn't modify "loop," etc.

As an indirect way to pick apart that argument, Transco endeavors to show that "woven" arguably *does* modify "hook" and "loop," and that by extension "nylon" arguably modifies "hook" and "loop" as well. Transco argues that promotional literature from the owner of Velcro®, to which Performance Contracting referred in describing its Velcro® fasteners (D. 12(M) ¶ 36), demonstrates that the hooks and loops can be described as "*woven*" (P.R.Mem. 19; D.Ex. E, boxes 4 and 5):

> HOOK TAPE COMPONENT is completely woven in one operation of a narrow fabric tape construction with selvages. The monofila-

ment Hooks are woven in the form of raised Loops which are heated to retain their shape.

> \* \* \* \* \* \*

> LOOP TAPE COMPONENT is completely woven in one operation of a narrow fabric tape construction with selvages. The base or ground tape is interwoven with a dense multiplicity of yarns to form a Pile or Loop surface.

15. "Comprise" is one of those words that has suffered from continuous misuse—what Fowler's *Dictionary of Modern English Usage* 102 (2d ed. Sir Ernest Gowers, 1965) describes as "a lamentably common use" and "a wanton and indefensible weakening of our vocabulary." Thus it is correct to say:

> Illinois comprises 102 counties.

It is not correct to employ the passive voice, as we so frequently encounter both in reading and in speech:

> Illinois is comprised of 102 counties.

As it happens, patent draftsmanship is one of the areas of English usage in which the purity of the term "comprise" is preserved.

and even if the patent is accorded a narrow range of equivalents (both those views being most favorable to Transco), the ensuing discussion shows that Transco's TA, A and G constructions would clearly still infringe the disputed element of Claim 1 under the doctrine of equivalents.[16]

As for the MA construction, the parties disagree as to its composition (see D. 12(N) ¶ 26; D. 12(M) and P. 12(N) ¶ 47). Performance Contracting claims that the MA construction is made of woven Nomex® base strips and simple nylon hooks. Transco denies that the MA construction is made of simple nylon hooks (see D. 12(N) ¶ 47), but it does not make clear what it contends the hooks are made of. Transco's denial seems to suggest (albeit rather ineptly) that the hooks of the MA construction are made of stainless steel.[17] Once again, however, irrespective of whether stainless steel or simple nylon is used, the MA construction would infringe under the doctrine of equivalents.[18]

As already set out, the specification referred to Performance Contracting's preferred use of "high temperature resistant nylon." Are fasteners with Nomex® strips and loops and stainless steel hooks in fact substantially equivalent to fasteners with such high temperature resistant nylon hooks, loops and mating strips?[19] Transco has presented 1992 and 1988 Du Pont literature defining aramid fibers and nylon fibers differently (P.Exs. 27, 28).[20] It has not, however, contended that the manner in which Nomex® functions is any different from functioning of high temperature nylon. Indeed, the evidence presented by Performance Contracting, that Nomex® was at one time considered to be and was advertised by Du Pont itself as a species of high temperature resistant nylon (D.Mem.

---

16. Because they were fighting on another battlefield, the parties did not specifically address the issue of infringement of the limitation "two woven nylon, hook and loop mating strips" under the doctrine of equivalents. But no material issue of fact emerges from the submissions, and the obviousness of the comparison permits the issue to be decided as a matter of law.

17. Transco refers to an earlier paragraph (D 12(N) ¶ 45) in which the composition of the hooks of the Transco construction was not at issue. However, the parties had there agreed that the earlier-referred-to construction had stainless steel hooks, and it may have been Transco's intention to argue by reference that the MA construction used the same type of hooks.

18. As stated earlier, there is a genuine issue of fact as to whether the fasteners in the MB construction are "either separate belts or straps or stainless steel tie wire locked by twisting" as Transco insists or whether, as Performance Contracting contends, they are hook and loop fasteners. Again it would be improper for this Court to opine on what may be a wholly hypothetical non-controversy.

19. All of Transco's strips and loops are made of Nomex®. As for its hooks, those in its TA, A, and G constructions are made of stainless steel (D. 12(M) and P. 12(N) ¶¶ 43, 45, 51), so that those constructions do not read literally on Claim 1. Turning to the composition of the MA and MB constructions, this Court finds the parties in disagreement. Performance Contracting claims that the MA and MB constructions have simple nylon hooks (see D. 12(N) ¶ 26, D. 12(M)

¶¶ 47, 49). As already stated, Transco denies that as to the MB construction, stating that the fasteners there are "either separate belts or straps or stainless steel tie wire locked by twisting" (P. 12(N) ¶ 49). If hook and loop fasteners are used, Transco asserts, that is done "only for neatness and appearance purposes" (id.). For the same reason already set out twice, no decision is reached as to that construction. Finally, Transco simply denies that the MA construction is made of simple nylon hooks (see P. 12(N) ¶ 47), but it does not say what the hooks are made of, nor does it offer any evidence on that score. For purposes of the present motion Transco must be deemed to have admitted that the MA hooks are made of simple nylon.

20. Both parties agree that Nomex® is an aramid fiber, while as stated later in this paragraph Du Pont's early advertising referred to it as a type of "high temperature resistant nylon." Even so, it is uncertain whether the difference is material in the Rule 56 sense. Du Pont's *Dictionary of Fiber & Textile Technology* defines "aramid fiber" as "[a] manufactured fiber in which the fiber-forming material is a long chain synthetic [polyamide] having at least 85% of its amide linkages (–NH–CO–) attached directly to two aromatic rings (FTC Definition)" (P.Ex. 27 at 8). "Nylon Fiber" is described as "[a] manufactured fiber in which the fiber-forming substance is any long chain synthetic [polyamide] having recurring amide groups (–NH–CO–) as an integral part of the polymer chain (FTC definition)" (id. at 103). Those definitions suggest that an aramid fiber could be described as a sub-species of nylon. However, without confirmation the issue of fact remains.

○

at 9; D.Ex. E at 10044, Ex. T), supports the conclusion that Nomex® is substantially equivalent to high temperature resistant nylon.

Although Transco further asserts that its constructions use stainless steel hooks (but see n. 19), that assertion merits a "so what?" response. Transco has offered no evidence that the use of stainless steel hooks creates any significant difference in function, way or result from the use of high temperature resistant nylon hooks. Again strips with high temperature resistant nylon hooks and stainless steel hooks would serve the same basic function: to hold the insulation in place. They would be equally easy to install and remove, and at least as heat-resistant as the high temperature resistant nylon strips and loops. Pinsky testified that stainless steel hooks clearly performed better than simple nylon hooks, which under testing "disintegrated" and "turned black," ultimately causing the release of the fastener (Pinsky Dep. 392–93, P.Ex. 9).[21] But high temperature resistant nylon hooks would not exhibit such tendencies. On the record now before this Court, then, the TA, A, G, and MA constructions would *appear* to infringe the limitation "two woven nylon, hook and loop fasteners" under the doctrine of equivalents.

Analysis under the doctrine of equivalents is necessarily incomplete for two reasons, however. In fact, the second of those reasons forces inquiry into an entire field not yet addressed by the parties.

First of all, any comparison between fasteners having Nomex® strips and loops and stainless steel hooks and fasteners having high temperature resistant nylon hooks, loops and strips has to assume the existence of such high temperature resis-

tant nylon hooks. But up to now neither party has offered evidence that they exist. All that Pinsky stated in his deposition was that he tested simple nylon hooks and stainless steel hooks, and that the first type failed. And so the question whether high temperature resistant nylon hooks do exist for purposes of analysis under the doctrine of equivalents must await further information from the parties.

There is a second topic—this one potentially outcome-determinative—on which input is required from the parties. Transco has suggested (though without providing argument or relevant law on the topic) that Pinsky violated the best mode requirement by failing to disclose to the patent attorney, so that the 1974 continuation application did not disclose, that Pinsky's tests had revealed that Nomex® strips and loops and stainless steel hooks were the best ingredients for the fasteners (P.R.Mem. 21 n. 10; Pinsky Dep. 135, P.Ex. 9).[22] Even though its final memorandum was filed later, Performance Contracting did not respond to Transco's footnoted innuendo.

Disclosure of the best mode "contemplated by the inventor" is mandated by 35 U.S.C. § 112. As *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1209–10 (Fed.Cir.1991) has put it:

> The best mode requirement thus is intended to ensure that a patent applicant plays fair and square with the patent system.... One must not receive the right to exclude others unless at the time of filing he has provided an adequate disclosure of the best mode known to him of carrying out his invention.

See also 2 Donald S. Chisum, *Patents* §§ 7.05–7.05[1] (1992).

In evaluating that issue, a court must first ask the subjective question "whether at the time the inventor filed his patent application, he knew of a mode of practic-

---

**21.** That may raise a red flag as to the validity of Claim 1 because it may be so broadly stated as to teach a device that does not work and that may require excessive experimentation by a prospective user to take advantage of its legitimate teaching (*Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 336 U.S. 271, 276–77, 69 S.Ct. 535, 538, 93 L.Ed. 672 (1949); *Atlas Powder Co. v. E.I. duPont de Nemours & Co.*, 750 F.2d 1569, 1576–77 (Fed.Cir.1984)). Because the parties have limited themselves to issues of infringe-

ment and not validity, nothing more will be said on that subject here. This opinion has assumed without deciding on the validity of the Pinsky patent.

**22.** That subject is somewhat related to, but not the same as, the validity issue created by the possibility that what *was* disclosed may have been impermissibly overbroad (see n. 21).

ing his claimed invention that he considered to be better than any other" (*Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 928 (Fed.Cir.1990)). If so, the question becomes "is the disclosure adequate to enable one skilled in the art to practice the best mode or, in other words, has the inventor 'concealed' his preferred mode from the 'public'?" (*id.*).

Here Claim 1 stated only that "woven nylon, hook and loop fasteners" are used, while the specification explained that "high temperature resistant nylon is preferred" (P.Ex. 4 at T112). *Chemcast*, 913 F.2d at 928 (emphasis in original) makes an important distinction between "best mode" and "enablement," to be kept in mind in the 35 U.S.C. § 112 inquiry:

> A patent applicant must disclose the *best* mode of carrying out his claimed invention, not merely *a* mode of making and using what he claimed. A specification can be enabling yet fail to disclose an applicant's contemplated best mode.

 In those terms Pinsky had done tests on various fastener ingredients and had determined, before the continuation application was filed, that Nomex® strips and loops and stainless steel hooks worked best (Pinsky Dep. at 135, P.Ex. 9). Even more, Pinsky had found that simple nylon hooks burned and failed in the heat of containment areas (*id.* at 392). It may be that Performance Contracting relies on the fact that no reference at all was made to the material of the hooks—on the current motion it has said that the claim language was not intended to specify the material of the hooks (D.Mem. 8). However, a complete failure to reveal material subject matter can be a violation of the best mode requirement (see *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1536 (Fed. Cir.1987) (failure to disclose the specific braze cycle used, which was the preferred means of attachment, violated the best mode even though no attachment means was described at all)).

 It seems at first blush, then, that a strong case might be made that the Pinsky patent is invalid for failure to disclose the

best mode of practicing the invention. Even though the present posture of the case precludes a ruling on that issue, it is so obviously evoked by what has been tendered to date that the litigants are now ordered to supplement their filings to permit this Court to deal with it promptly.

*3. "the glass cloth has a finish of a leachable organic silicate carried in a fatty and mineral oil vehicle."*

Claim 1 of the Pinsky patent also contains the limitation that "the glass cloth has a finish of a leachable organic silicate carried in a fatty and mineral oil vehicle." Transco argues that the prosecution history narrows the Pinsky patent to that specification because (1) its limitation was not in the original patent application's Claim 1 and (2) the application was approved only after the limitation was added (P.Mem. 21–24; P.Ex. 4 at T140, P.Ex. 3 at T089, 099, P.Ex. 4 at T114, 121).

For its part Performance Contracting does not specifically contest the limitation. It rather states that the finish used by Transco is the same as or substantially equivalent to that used by Performance Contracting (D.Mem. 11; D. 12(N) ¶ 28).

Performance Contracting uses Burlington Industries' 603A fabric and claims that it has the finish of a "leachable organic silicate carried in a fatty and mineral oil vehicle" (D. 12(M) ¶ 35). Transco uses JPS Glass Fabric's 9383 cloth in the TA, A, and G constructions (D. 12(M), P. 12(N) ¶¶ 43, 45, 51). Performance Contracting contends that while those constructions "do not have the quoted element," nonetheless the finish is equivalent (D. 12(M) ¶¶ 44, 46, 52). As for the MA and MB constructions, Performance Contracting says that they use Burlington Industries' 603A fabric (D. 12(M) ¶¶ 47, 49, D.Mem. 10, D.Exs. H, I, Pinsky Aff. ¶ 14, Vaughan Aff. ¶ 5). Transco denies that, but it nowhere explains what fabric it claims to be used in the MA and MB constructions (P. 12(N) ¶¶ 47, 49).[23]

Transco admits that the 9383 and 603A fabrics may be similar (P.R.Mem. 6). Thus Performance Contracting accurately points

---

**23.** Transco's responses to D. 12(M) ¶¶ 47 and 49 merely refer to earlier responses. However, the

out that Transco has not argued that the 9383 finish is not equivalent to the 603A finish (D.R.Mem. 11). But in this infringement action the inquiry is not simply whether those two finishes are equivalent as such—instead the proper question is whether the 9383 fabric can be said to be substantially equivalent to a fabric that has "a finish of a leachable organic silicate carried in a fatty and mineral oil vehicle."

Transco contends that it cannot (P. 12(M) ¶ 28, P.Mem. 25–27). Transco explains that the "finish" of the 9383 fabric is not something added to the material but rather is a "wash and clean" heating process to remove as much of the oils and lubricants in the sizing or the binder as possible without crystallizing the glass (P.Ex. 11, JPS Dep. 37–38, 46–47). Transco presented evidence that JPS Glass Fabrics (the fabric weaver and finisher) did not design the fabric to be leachable (Waddington Dep. 44–45) and that PPG (the maker of the glass yarn) does not use in its binder lubricant either a "leachable organic silicate" or a "fatty and mineral oil vehicle" (Lawton Dep. 47). Transco has also presented evidence that neither the United States Coast Guard Specifications for Incombustible Materials nor Owens–Corning Fiberglas' discussion of how to meet Navy stainless steel stress corrosion specifications mentions doing so with a fabric having a "finish of a leachable organic silicate in a fatty and mineral oil vehicle" (P.Exs. 17, 18).

Performance Contracting has presented testimony that "a leachable organic silicate carried in a fatty and mineral oil vehicle," although technically "not completely accurate," would have been understood to one of ordinary skill in the art in 1973 to be a "generic description for 603A finish" (Vaughan Aff. ¶ 3). Performance Contracting has also presented evidence that both the 603A cloth and the 9383 cloth contain silicates (D.Exs. I, K).

For purposes of Transco's motion for summary judgment of noninfringement,

this Court must credit Performance Contracting's evidence that the 603A cloth would have been understood by one of ordinary skill in the art to have a "finish of a leachable organic silicate carried in a fatty and mineral oil vehicle." Because Transco has not contested the equivalency of 603A cloth and 9383 cloth, Transco has failed to show noninfringement of that limitation by any the TA, A and G constructions. And absent any evidence to counter Performance Contracting's evidence that the MA and MB constructions use 603A cloth, Transco has also not shown that those constructions are noninfringing as to the literal terms of the limitation now in issue.

■ But on the other side of the coin (that is, on Performance Contracting's motion for judgment of infringement), this Court must accept as true Transco's evidence that there is no such creature as cloth with a "finish of a leachable organic silicate carried in a fatty and mineral oil vehicle." Every inventor must describe his or her claims with such clarity that "persons of skill in the art will recognize that the applicant made the invention having those limitations" (*Martin v. Mayer*, 823 F.2d 500, 505 (Fed.Cir.1987)). If Performance Contracting has indeed described a finish that does not exist, then neither the 9383 cloth used in the TA, A and G constructions nor 603A cloth, which may be used in the MA and MB constructions, can be said to infringe the limitation at issue either literally or equivalently.

■ As to this last limitation, then, the risk of dual defeat of cross-motions under Rule 56 that this opinion identified earlier has unfortunately been realized. And that spells defeat for both sides on their respective summary judgment motions.

### Conclusion

Transco has not shown that any single limitation in the Pinsky patent is *not* infringed by the five accused Transco constructions. Transco's motion for a summary judgment declaring noninfringement is therefore denied. And although Performance Contracting has shown that one lim-

---

fabric was not at issue in the earlier responses, because Performance Contracting had admitted that the TA and A constructions used the 9383 fabric. Any reference back to those responses

therefore cannot be taken as an assertion that the MA and MB constructions utilize the 9383 fabric as well.

itation ("a plurality of spaced quick release and engage fasteners") is infringed by four Transco constructions, the waters remain muddied as to the second limitation ("two woven nylon, hook and loop mating strips"[24]), and Performance Contracting has not demonstrated that the third challenged limitation in Claim 1 of the Pinsky patent is infringed either literally or equivalently by the Transco constructions. Performance Contracting's motion for summary judgment of infringement is therefore denied as well.

Two things remain. First, both parties are ordered to provide simultaneous submissions (whether evidentiary or legal in nature, or both) on the "best mode" question on or before February 10, 1993. Second, if those submissions do not prove dispositive on validity grounds, Rule 56(d) findings by this Court are called for to conform to the rulings in this opinion. Accordingly the parties' February 10 submissions should also include proposed forms of order toward that end.[25]

APPENDIX 1

24. It should again be remembered that for current purposes the validity of that element as part of Claim 1 has been assumed.

25. This opinion cannot conclude without an expression of special thanks to this Court's law clerk, Susan Pacholski, whose extensive draft provided the major input (more than that of the combatants) that has ultimately led to this Court's conclusions. Despite the handicap of her having to start from scratch in delving into the arcane mysteries of patent law, Ms. Pacholski perceived issues that had not been addressed (or had not been fully addressed) by the able and experienced counsel for the parties, and that in material part formed the basis for this Court's further exploration and exposition in this opinion. It should of course be emphasized that the ultimate responsibility for what is said here (including the crafting of the opinion and the reading and analysis of every cited case) is borne, and has been carried out, by this Court— so that if any errors were to be perceived here, they would in no way be ascribable to Ms. Pacholski.